Michael BOOTHE, Petitioner-Appellee,

v.

SUPERINTENDENT, WOODBOURNE CORRECTIONAL FACILITY and Honorable Robert Abrams, Attorney General of the State of New York, Respondents-Appellants.

No. 1423, Docket 81–2067.

United States Court of Appeals, Second Circuit.

Argued June 2, 1981.

Decided Aug. 6, 1981.

Greg A. Danilow, New York City (Lawrence S. Robbins, Kramer, Levin, Nessen, Kamin & Soll, New York City, on the brief), for petitioner-appellee.

Michael J. Halberstam, Brooklyn, N. Y. (Eugene Gold, Dist. Atty., Kings County, Dan A. Landes, Asst. Dist. Atty., Brooklyn, N. Y., on the brief), for respondents-appellants.

Before MESKILL and KEARSE, Circuit Judges, and LASKER,* District Judge.

KEARSE, Circuit Judge:

The State of New York appeals from an order of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Chief Judge, granting a writ of habeas corpus and vacating a judgment of the Supreme Court of the State of New York convicting petitioner-appellee Michael Boothe of various crimes. The ground for the granting of the writ was that when Boothe had become unruly and disruptive during the voir dire in his state trial, causing the court to order him bound and gagged, the State did not supply funds for electronic equipment with which Boothe could monitor the proceedings from outside the courtroom. The district court held that the failure to supply such funds or facilities denied Boothe due process of law. We reverse.

## FACTS

The facts relating to Boothe's state court trial are set forth in greater detail in the opinion of the district court, reported at 506 F.Supp. 1337, familiarity with which is assumed. Those most pertinent to the present appeal may be stated briefly. In 1974, Boothe was tried before a jury in state court on charges arising out of a grocery store robbery. During the examination of the prospective jurors, Boothe personally, although he was represented by counsel, objected strenuously and obstreperously to the prosecutor's use of peremptory challenges to exclude black veniremen from the panel. The court called a recess, and after some colloquy with Boothe's counsel, asked Boothe if he would agree to continue the trial in an orderly fashion; Boothe indicated that he would not. When Boothe refused to obey the trial court's instruction to be silent and instead continued what that court described as his "disruptive tactic[s]," the court ordered him bound and gagged. Id. at 1339.[1] Prior to taking this action the trial judge inquired whether the building had any facilities that would have enabled Boothe to monitor the proceedings from a room other than the courtroom; on being advised that there were no such facilities, the judge lamented the lack of funds—referring generally to broken political promises—to provide such equipment. Boothe remained bound and gagged until after the jury was empaneled and the opening statements were about to begin.

Boothe was eventually convicted of robbery, grand larceny, assault, and possession of weapons, and was sentenced to concurrent indeterminate terms whose maximum ranged from four to twenty-five years. He appealed his conviction to the Appellate Di-

---

* Honorable Morris E. Lasker, of the United States District Court for the Southern District of New York, sitting by designation.

1. Even in his bound and gagged condition Boothe continued to behave disruptively. Id.

vision, Second Department, arguing a single point: that he was deprived of his right to an impartial jury when the court had him bound and gagged during the voir dire. Conceding that his behavior had been "uncivil," the principal contention in his 16-page brief was that his incivility had been provoked by the court and that he therefore did not deserve to be shackled:

> The gag order would not have been necessary if the court itself had not goaded appellant into disruptive behavior.

(Boothe's Appellate Division brief at 11.)

> The court's order to bind and gag appellant was not a necessary "last resort" (*Allen v. Illinois*, [397 U.S. 337, 339–40 [90 S.Ct. 1057, 1058–59, 25 L.Ed.2d 353] (1969)]). On the contrary, the court itself unnecessarily provoked appellant's disruptive conduct.

(*Id.* at 12.)

> As appellant's disruptive behavior was provoked by the court, it did not justify the forfeiture of his right to be tried by an impartial jury.

(*Id.* at 14.)

> As the escalating courtroom disorder was provoked by the court, the order to bind and gag appellant was not a justified last resort.

(*Id.* at 15.) Boothe argued that the court should have removed his bonds and gag and brought in a new array of jurors. (*Id.* at 14.)

Boothe's conviction was affirmed by the Appellate Division by order dated February 28, 1977; leave to appeal to the New York State Court of Appeals was denied by order dated June 10, 1977 (Wachtler, J.). Boothe thereafter made several motions in the nature of *coram nobis*, New York Criminal Procedure Law § 440.10 et seq. (McKinney 1971), none of which dealt with the jury selection stage of his trial.

In 1979, Boothe brought his present petition for habeas corpus, *pro se*, asserting four grounds for the granting of the writ: (1) that the jury was illegally selected because the prosecutor had exercised his peremptory challenges systematically to exclude blacks, (2) that his trial counsel had been ineffective, (3) that the trial court had unduly interfered in the trial, and (4) that his appellate counsel had been ineffective. The district court found all of these claims to be without merit. Preliminary Memorandum and Order dated December 13, 1979. But it found a fifth claim "implicit" in the petition: a claim of "constitutional deprivations caused by the highly disruptive nature of the voir dire." *Id.* at 3–4.

As to this implicit claim the court noted as follows:

> There was violence by defendant, public charges of racial prejudice, tying and gagging of petitioner and a proceeding that verged on a shambles.... The trial court appears to have made good faith efforts to minimize prejudice by instructions to the jury and admonitions to defendant and to counsel as well as by periodically tying and gagging of the defendant. Nevertheless, it is doubtful that the all white jury trying this black, disruptive defendant, could have been unaffected by the scene. As one member of the panel put it: "It's [sic] stirring me up. Bothering my stomach." ...

> The trial judge under such circumstances is in an almost impossible position. Through no error on his part or of that of counsel or any other person except defendant, a fair and impartial trial may have been made impossible.

*Id.* at 9. Finding these issues novel and difficult, the court appointed counsel to represent Boothe, and asked both sides to brief the implicit claim. *Id.* at 11–12.

Following the submission of briefs and the presentation of a stipulation as to the costs of various types of audio and video monitoring devices,[2] the district court granted the writ on the ground that the State, by having failed to provide funds for electronic devices that would have allowed Boothe to witness the proceedings from a

---

2. The court found that an audio system could be purchased and installed for $1400–$1730, and a video system could be installed for an additional $800–$900. 506 F.Supp. at 1340.

place removed from the courtroom, had denied Boothe due process of law.[3] The court emphasized that the trial court had not abused its discretion in deciding to have Boothe bound and gagged, 506 F.Supp. at 1344, 1345, but ruled that the State had

3. The district court ordered that a new trial be held, but stayed this order pending the outcome of the present appeal.

4. *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) exemplifies our legal system's ancient disdain for physically restraining defendants in the courtroom.

\* \* \* \* \* \*

No court has declared the use of shackles *per se* unconstitutional; a trial court must have discretion to use some devices in preserving order in the courtroom. Nevertheless, our courts agree that shackles be a measure of last resort, justified only where no less drastic alternative would suffice.

\* \* \* \* \* \*

This search for less prejudicial alternatives where constitutional rights are at stake is part of a broad constitutional policy. *See, e. g., Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (invalidating law that obligated school teachers to disclose the organizations to which they belonged in part because "less drastic means for achieving the same basic purpose" were available); . . . .

\* \* \* \* \* \*

A mandate that binding and gagging be "a last resort," *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), would be a mere persiflage if it did not import the message that some funds might need to be expended to finance alternatives. Speaking of physical restraints in the courtroom, the Sixth Circuit has held that "only upon a clear showing of necessity *should shackles ever be employed*. One element of such necessity is that less drastic security precautions to prevent escape, even at some additional cost to the state, will not provide the needed protection."

\* \* \* \* \* \*

That petitioner brought the restrictions on himself by obstreperous behavior is irrelevant in resolving the question now posed. His behavior required only that the court exercise *some* means of control; it did not authorize the court to use controls unnecessarily restrictive of petitioner's right to a fair trial. Whether or not petitioner may have waived his right to be physically present during the course of his trial, he did not give up his right to an unprejudiced jury.

\* \* \* \* \* \*

*Arguendo* the trial court would not have abused its discretion had it decided that the proper way to handle the emergency created

deprived the judge of the ability to consign Boothe to a remote monitoring location, and thus had violated Boothe's constitutional right to a fair trial. *Id.* at 1346. Excerpts from the court's opinion are set forth in the margin.[4]

by defendant's conduct was to do what he in fact did—have the petitioner bound and gagged in full view of the jury. The fact is, however, that the court exercised its discretion not to use this option, but rather to utilize a less prejudicial technique now readily available. The state by failing to provide proper facilities denied the court the opportunity to fulfill its constitutional duty of protecting defendant's rights. Every person in this country is entitled to the protection of a puissant court.

Due process requires the courts to adjust to changing technology. The meaning of the Constitution may remain the same but its manifestations and impact vary with time. . . . At any given time, the process that is due defendants must be a function of the rapidly evolving technology that is contemporaneously available.

\* \* \* \* \* \*

Electronic monitoring devices are plainly a less drastic alternative to binding and gagging a defendant. They should be considered by a trial court before imposing shackles. Where, as here, the court decided to use such a device but was unable to make use of it due to state-imposed financial constraints, petitioner was deprived of his right to the least drastic means of control. The mere fact that such devices were not available during petitioner's trial because the state did not provide them does not vitiate petitioner's right to insist that when the trial court wishes to exercise that option it be available to him.

Because the State failed to provide monitoring equipment, the trial court did not have the means to select the form of control that it preferred and that would have been less restrictive of the petitioner's constitutional rights. The small effort required of the state in this instance lends force to the perception that the trial court was wrongly denied the opportunity to exercise its discretion.

The trial judge did not abuse its discretion, he simply was prevented from exercising it. We hold not that the trial court's exercise of discretion was abused, but rather that it was impermissibly frustrated by the state's refusal to supply the necessary equipment.

\* \* \* \* \* \*

The trial court was prevented from protecting the rights of the defendant because of lack of proper facilities. Under the circumstances due process was denied.
506 F.Supp. at 1340–46.

## DISCUSSION

It has long been settled that "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), *citing Ex parte Royall*, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886).

In order to exhaust his state remedies a petitioner must have "fairly presented" to the state court the same claim that is the basis for his petition for habeas corpus. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). This requires that the facts on which the defendant relies have been called to the attention of the state court, *e. g., United States ex rel. Cleveland v. Casscles*, 479 F.2d 15 (2d Cir. 1973), and that the state court be informed of the legal basis for the claim. *E. g., Picard v. Connor, supra; Johnson v. Metz*, 609 F.2d 1052 (2d Cir. 1979).

*Twitty v. Smith*, 614 F.2d 325, 331 (2d Cir. 1979). These principles are designed to "ensure that the federal courts not intrude upon state proceedings unless and until the state courts have been given a fair opportunity to consider and act upon the claims on which the habeas corpus petition is based." *Id.* They have no less applicability when the claim is not one explicitly asserted by the prisoner but is seen by the federal court as implicit.

These requirements have not been met in the present case with respect to the claim on which the writ was granted. Boothe's brief on appeal to the state court argued simply that the trial court was at fault for having provoked Boothe to engage in disruptive behavior, that having been the instigator the court should not have caused him to be shackled, and that the prejudice caused by the court's goading him into uncivilized behavior and then shackling him could have been cured by unshackling him and starting the jury selection process

anew.[5] His argument to the state court was inadequate to set forth fully either the facts upon which the district court's decision here turned or the legal basis for the decision. For example, nowhere in Boothe's state court brief is there any suggestion that the trial judge wanted to exercise his discretion to provide electronic remote monitoring for Boothe. Indeed, there is no reference whatever to electronic monitoring devices. Nor do we find in Boothe's state court brief any semblance of a suggestion that the State deprived Boothe of due process by failing to provide alternatives to shackling, to which the trial court could have resorted if available. Thus, far from arguing that the lack of facilities had deprived a blameless trial judge of the opportunity to exercise his discretion, Boothe repeatedly blamed his incivility on provocation by the judge.

Boothe argues here that the implicit claim was in fact presented to the state court because his state brief argued that shackling was not necessary as a "last resort," and quoted *Illinois v. Allen, supra*, as allowing shackling only when there is "no other solution." We hardly think these phrases sufficed to alert the reader to a claim that there should have been available closed circuit television cameras or other electronic devices. Nor do we think it likely, given the stream of attacks on the trial judge as the instigator of Boothe's unruly behavior, that either the prosecutor or the state courts would have understood that the claim was in fact that the trial judge was blameless and had had the bounds of his discretion unconstitutionally curtailed by the fiscal restraints of the State. In short, we conclude that Boothe did not fairly present to the state courts the claim that formed the basis for the granting of his habeas corpus petition, and that he thus has not exhausted his state remedies on this claim.

Without intending to express any approval of the merits of such a claim, we reverse

---

**5.** Of course, Boothe is free to present to the appropriate federal district court a petition for a writ of habeas corpus with regard to the matters articulated on his appeal to the Appellate Division as described above.

the judgment granting the writ on the ground that Boothe did not exhaust his state remedies and direct that the petition be dismissed.