**Johnny SPAIN, Petitioner–Appellee,**

v.

**Ruth L. RUSHEN, Director, California Department of Corrections, Respondent–Appellant.**

No. 86–2687.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1988.

Withdrawn from Submission Nov. 18, 1988.

Resubmitted Dec. 22, 1988.

Decided Aug. 22, 1989.

---

Ronald E. Niver and John H. Sugiyama, San Francisco, Cal., for respondent-appellant.

Dennis Riordan, Riordan & Rosenthal, San Francisco, Cal., for petitioner-appellee.

Before HALL, KOZINSKI and NOONAN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Ruth Rushen, Director of the California Department of Corrections, appeals from the district court's grant of a writ of habeas corpus to Johnny Spain. Rushen contends that the district court erred in determining that the state trial court violated Spain's constitutional rights by shackling Spain during his criminal trial. We affirm.

I

In 1971, Johnny Spain was imprisoned in San Quentin Prison and was a member of the Black Panther Party.[1] Spain was serv-

1. The Black Panther Party was a revolutionary group founded in 1966 in Oakland, California

ing a life sentence for a 1967 conviction for first degree murder. In May of 1971, Spain was transferred to the Adjustment Center at San Quentin, a three-story structure primarily used to segregate and discipline disruptive prisoners.

On August 21, 1971, there was an outburst of deadly violence at the Adjustment Center. George Jackson, also a member of the Black Panther Party, returned to the Adjustment Center after meeting with his lawyer, Stephen Bingham. When guards found a bullet clip on Jackson, Jackson removed a gun from under his wig and forced one of the guards present to open the cells of other prisoners. Many of the prisoners, including Spain, emerged from their cells. There was testimony that Spain played a role in binding guards and placing them in the cells where they subsequently were assaulted. He was seen approaching the guards with an earphone cord in his hands. The cord was of the type used to bind the guards. There also was testimony that at one point he held Jackson's gun, which was used to murder two of the guards.

When an alarm was sounded, Jackson and Spain fled from the Adjustment Center, Jackson with a gun in his hand and Spain with some keys. Jackson was shot by guards and was killed instantly. Spain dove into some bushes where he was found hiding. When order was restored the aftermath of the violence was revealed: one officer had bled to death from a neck wound; two had been shot to death in the head; three others had their throats slashed, but survived; and two prisoners died of similar wounds. The Director of Corrections called the incident the worst in her eight years as Director.

Officials found a number of weapons and knives in their subsequent search. In Spain's back pocket, officials found a six inch long vial wrapped in tape, which Spain identified as an explosive. A search of Spain's cell revealed a road map with an escape route and, hidden inside bars of soap, thirteen rounds of .38 caliber ammunition, four .410 gauge shotgun shells, and one .22 caliber magnum shell.

Spain was charged with five murder counts, one conspiracy count, and one assault count. The prosecution attempted to show that the Black Panther Party had organized the escape attempt and that Spain was linked to the conspiracy by his membership in the Black Panthers. Spain did not testify; his defense was that he could not recall anything from the time his cell door opened to the time he ended up outside the Adjustment Center.

In a trial with five other prisoners, Spain was found guilty of two counts of first degree murder and of conspiracy to escape by force or violence; he was acquitted of the other four counts. In the courtroom during the trial, Spain was shackled. He wore leg irons, a waist chain to which each of his hands was bound by individual chains about eight inches long, and chains that apparently held him to his chair.[2] Spain, already serving a life term for mur-

---

that reached its peak by the early 1970s. The group adopted a platform calling for, among other things, the arming of all blacks, the release of all blacks from prison, and the trial of blacks by all-black juries. The platform also stated, "We will protect ourselves from the force and violence of the racist police and the racist military by whatever means necessary." R. Major, A Panther Is a Black Cat 285–88 app. A (1971); D. Schanche, The Panther Paradox: A Liberal's Dilemma 88–90 (1970). Throughout the Party's history, its members were involved in numerous violent altercations with police. See R. Major, supra, at 296–302 app. E.

**2.** A neck chain was applied during transportation to and from prison. It is unclear whether Spain wore this neck chain before the jury.

At argument, Spain's counsel said he had no recollection that the neck chain was used in view of the jury, although it was used for transportation and at certain pretrial proceedings. On January 11, 1974, Lt. Campbell, a security officer for the California Department of Corrections, described for the court the restraints that were in place in the courtroom. He explained that the neck chain was removed once the defendant was in his seat in the courtroom and that the neck chain was used to lock the leg irons chain to the base of the chair. On cross-examination, Spain's counsel did not challenge this account.

The magistrate who held an evidentiary hearing on the effect of the shackling did not resolve this factual matter. The magistrate recognized that the photographs Spain introduced showed him in the courtroom without the neck chain,

der, was sentenced to another term of life imprisonment in 1976.

■ On June 29, 1982, the District Court for the Northern District of California issued Spain a writ of habeas corpus because it determined that Spain's constitutional rights were violated by *ex parte* communications between the trial judge and a juror. *Spain v. Rushen,* 543 F.Supp. 757 (N.D. Cal.1982), *aff'd mem.,* 701 F.2d 186 (9th Cir.), *vacated,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). Although a challenge to the constitutionality of Spain's shackling was raised in his habeas petition, the district court did not reach that issue. We affirmed the district court in an unpublished decision. 701 F.2d 186. The Supreme Court reversed and vacated the judgment, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 and noted that Spain's argument that his constitutional rights were violated when he was shackled was to be resolved on remand, *id.* at 117 n. 1, 104 S.Ct. at 455 n. 1. On remand, the district court referred the case to a magistrate for an evidentiary hearing to determine the effect Spain's shackling during the trial had on his ability to cooperate with his trial attorney and to testify in his own defense. The magistrate made the following findings of fact:

1. Petitioner's shackling at trial aggravated his existing medical and psychological problems, and pained and preoccupied him during that time.

2. Petitioner's shackling interfered with his ability to communicate with his trial counsel and to participate in the preparation of his own defense.

3. Petitioner's shackling impeded his ability to testify on his own behalf.

Evidentiary Report at 6–7, *Spain v. Rushen,* No. C–81–4858 TEH (JSB) (N.D.Cal. Oct. 9, 1985) [hereinafter Evidentiary Report]. The district court virtually adopted these findings,[3] *Spain v. Rushen,* No. C–81–4858 TEH, at 5 (N.D.Cal. Sept. 22, 1986), determined that Spain's due process

---

but with two added chains: one that attached his leg irons to the base of the chair, and one around Spain's waist that attached to the back of the chair. This is consistent with the testimony of Lt. Campbell on the use of the neck chain in the courtroom. Spain testified that the photograph showing him with leg shackles, the waist chain, a chain connecting the leg shackles to the base of the chair, and another chain connecting his waist to the back of the chair, but without the neck chain, depicted basically the same chains he wore during trial. However, he also testified that the neck chain was removed while in the holding cell, but it was "reapplied in the courtroom itself."

Nor did the district court resolve this dispute. Nevertheless, we need not remand for a finding of fact because the resolution of this dispute does not affect the result in this case.

**3.** Spain and other inmates housed in the Adjustment Center (AC) at San Quentin prison filed a section 1983 action claiming that their confinement and treatment at the AC infringed upon their constitutional rights. 408 F.Supp. 534, 537 (N.D.Cal.1976), *modified in part, affirmed in part, and reversed in part,* 600 F.2d 189 (9th Cir.1979). This action overlapped with Spain's state court criminal trial. The district court focused exclusively on the impact of the internal functioning of the AC on the plaintiffs, *id.* at 537, 538, stating emphatically: "All that the court is now called upon to decide is the constitutionality of the length and conditions of their confinement and treatment at the AC," *id.* at 539. In so doing, the court reviewed "the physi-

cal plant of the AC and its cells, noise levels, heating and ventilation, exercise, discipline, use of tear gas, use of restraints, medical care and attention, diet, clothing, hygiene, access to counsel, access to the media, and visitor and mail privileges and procedures." *Id.* at 538. Judge Zirpoli himself inspected San Quentin, paying particular attention to the conditions of the AC. *Id.*

The district court held that "the abhorrent and shocking use of excessive restraints in the combined form of hand manacles, waistbelt, leg chains, and neck chains for *all* of plaintiffs' out-of-prison movements constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States." *Id.* at 545 (footnotes omitted). The court, however, rejected plaintiffs' first and sixth amendment claims that the prison conditions at the AC denied them access to the effective assistance of counsel, to the courts and to the media, invaded their privacy, and deprived them of medical care and adequate nutrition. *Id.* at 546. The court concluded that these claims "are not of such constitutional dimensions as to justify intervention by a federal court." *Id.* Upon rejecting the plaintiffs' first and sixth amendment bases for section 1983 relief, the court, apparently referring to the quality of medical care and nutrition, noted that the "[p]laintiffs were found to be in good physical condition." *Id.*

The dissent seizes upon this finding in an attempt to circumvent the district court's findings below. This attempt is futile. The dissent's first error is to substitute its own factual

right to a fair trial was violated by being shackled at trial, and issued a second writ of habeas corpus.[4] From this writ, Rushen appeals.

## II

We review de novo the district court's decision to grant a petition for writ of habeas corpus. *Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir.1986), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987).

### A

Generally, a criminal defendant has a constitutional right to appear before a jury free of shackles. *See Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th Cir. 1985). However, a trial judge's decision to shackle a defendant is not per se unconstitutional. *Stewart v. Corbin*, 850 F.2d 492, 497 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1737, 104 L.Ed.2d 175 (1989). "The trial court has discretion to use shackles or other security measures when circumstances dictate." *Wilson*, 770 F.2d at 1484. Thus, we review for an abuse of discretion a trial judge's decision to shackle a defendant. *Stewart*, 850 F.2d

---

determinations for those of the district court in this habeas action. The dissent thus improperly assesses the credibility of Spain's testimony. *Post*, at 734–35. The dissent compounds this error with yet another: it fails to acknowledge the critical distinction in the inquiries facing Judge Zirpoli and the district court below. It is this failure that causes the dissent erroneously to perceive inconsistency in the findings of the district judges.

Judge Zirpoli examined only the question whether the conditions *inside the prison* infringed upon Spain's constitutional rights to require relief under section 1983. He did not even purport to address whether the excessive chaining *inside the criminal courtroom* deprived Spain of a fair trial. In fact, Judge Zirpoli recognized the different concerns involved in the state criminal trial, as indicated by his modified order halting the use of shackles in the AC, which specifically "[did] not apply to state trial proceedings in the courthouse and courtroom of Marin County." This recognition is also evident in his finding that "[t]hough the evidence reveals incidents which have resulted in an invasion of plaintiffs' right of privacy in their attorney-client relationship ..., no *pattern* emerges which necessitates injunctive relief." 408 F.Supp. at 546 (emphasis in original). We see no irreconcilable inconsistency between Judge Zirpoli's general finding of good health and the more specific finding in this case that Spain suffered from back problems severe enough to cause him great discomfort when he was required to wear twenty-five pounds of chain ten to twelve hours a day for five years.

Indeed, Judge Zirpoli's findings dovetail neatly with the district court's findings in this case. Upon concluding that the excessive chaining constituted cruel and unusual punishment, Judge Zirpoli stated that "[m]anacles, shackles, waistbelts, leg and neck chains are painful devices which inflict corporal punishment on those wearing them. They engender pain, hu-

miliation, rage, and resentment...." *Id.* at 545 n. 15. The district judge then noted: "The cruel and unusual character of the punishment resulting from the combined restraints employed was clearly evident from the court room demonstration in the course of the hearings in this case." *Id.* This last observation, in particular, disposes of the dissent's attempt to avoid the consequences of the district court's findings in this habeas action.

4. In attacking the underlying factual basis for granting the writ, the dissent asserts that Spain had a "full opportunity to challenge [before Judge Zirpoli] the conditions to which he was subject at the time." *Post*, at 735. The plain suggestion is that Judge Zirpoli was fully empowered to enjoin the state trial court from chaining Spain.

However, this ignores fundamental principles of comity and federalism, which were forcefully espoused in *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971) (underscoring "the fundamental policy against federal interference with state criminal prosecutions"). *See also Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1981). Under *Younger*, a federal court should abstain if, at the time the plaintiff initiated the federal action, (1) a state judicial proceeding was ongoing; (2) that proceeding implicated important state interests; and (3) the proceeding presented an adequate opportunity to raise constitutional challenges. *DeSpain v. Johnston*, 731 F.2d 1171 (5th Cir.1984) (citing *Middlesex Ethics Comm.*, 457 U.S. at 432, 102 S.Ct. at 2521). Hence, the *Younger* doctrine would have placed before Spain a virtually impenetrable barrier to challenge in federal court the manner in which the state court conducted its criminal proceeding. *See Mann v. Jett*, 781 F.2d 1448, 1449 (9th Cir.1986) (abstention appropriate in 1983 action where plaintiff could "adequately litigate in the ongoing state criminal proceedings his underlying claim of unconstitutional deprivation of counsel").

at 497–98; *Wilson,* 770 F.2d at 1485.[5]

## B

As mentioned, the district court below adopted the magistrate's factual findings. Before we can determine whether the trial court abused its discretion, we must first examine these findings, which are reviewed for clear error. Fed.R.Civ.P. 52(a).

Rule 52(a) provides: "Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Because in this case the findings in large measure depend on credibility determinations, we must accord particularly wide-ranging latitude, or "special deference," to the district court. *See Anderson v. Bessemer City,* 470 U.S. 564, 574, 575, 105 S.Ct. 1504, 1511, 1512, 84 L.Ed.2d 518 (1984).

In *Anderson,* the Court sent a clear message to the courts of appeals warning us not to "reverse the finding of the trier of fact simply because [we are] convinced that [we] would have decided the case differently." *Id.* at 573, 105 S.Ct. at 1511. This is a principle we "must constantly have in mind." *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969)). And

> when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* 470 U.S. at 575, 105 S.Ct. at 1512.

We believe that the emphatic sentiments expressed in *Anderson* command us to ac-cept the district court's findings. The magistrate considered medical reports, which included Spain's medical history and his prison medical records, and the live testimony of Spain, Charles R. Garry (Spain's counsel), and two experts in psychology. In considering the live testimony, the magistrate did not accept each witness's account uncritically. Compare *Henson v. CIR,* 835 F.2d 850 (11th Cir.1988). She properly discounted the weight of the witnesses' testimony as appropriate.

Spain called Dr. Delman, a psychologist, and the state called Dr. Sutton, a psychiatrist, in an attempt to reconstruct Spain's state of mind during the trial. The magistrate provided the following background:

> Dr. Delman ... has seen Spain four times in the last couple of years, each interview spanning 2–3 hours. Delman did not interview anyone other than Spain, his friends, and supporters. Although Delman did review Spain's prison psychiatric file, Delman did not speak to any correctional officers, prison officials, or persons involved in Spain's prosecution. Delman's opinion was that "Spain was so depressed and pessimistic and beaten by the chains, that I don't believe he was capable of cooperating [in his defense] in a reasonable way."

> Dr. Sutton [is] a staff psychiatrist at San Quentin.... Sutton examined Spain before and at the time of trial. She testified that she saw Spain on "several occasions," but one of those occasions was a group interview with three of his co-defendants. Moreover, Sutton had no recollection of speaking with Spain when he was in shackles or discussing the subject with him.

Evidentiary Report, *supra,* at 6–7. The magistrate then concluded that the value of

---

**5.** The dissent recognizes that *Wilson* unequivocally sets forth an abuse of discretion standard. See *post,* at 729. Nevertheless, the dissent proceeds to assert that *Stewart* has "liberated" us from this purportedly incorrect phrasing of the standard. This is derived from *Stewart's* admonition that the "[i]ssue ... is not whether in retrospect, the trial court could have handled the matter better, but rather, whether the trial court denied appellant a fair trial under the circumstances." 850 F.2d at 497.

However, the quoted language is consistent with the abuse of discretion standard; that language only clarifies the standard in the context of a trial court's decision to impose shackles. That is, federal courts are not to find an abuse of discretion merely by second-guessing state trial courts. Indeed, *Stewart* stated that the balancing of competing interests "is left to the *discretion* of the trial court." *Id.* at 499 (emphasis added).

the experts' testimony was "limited." *Id.* at 7. She did not indicate, however, that this testimony would be dismissed entirely.

The magistrate also commented about the testimony of Garry. She found some of his testimony "marked by hyperbole" and his recollection of the events hazy at times. *Id.* at 6–7. Accordingly, the magistrate did not give it "substantial weight." *Id.* But nor did she dispense with his testimony altogether. For example, the magistrate found exaggeration in Garry's assertion that "there was no way in the world I could communicate with [Spain]." *Id.* at 10 (quoting Garry's testimony). However, she then concluded that "Garry's statement that 'more than three-quarters of … [their time together] was [spent] talking about how he was being treated … how degraded he felt [when he walked into the courtroom]' [was] probably close to the truth." *Id.* (quoting Garry's testimony).

Spain testified at length before the magistrate. His testimony spanned more than 100 pages of transcript. He claimed to have experienced great physical and mental pain during both the pretrial proceedings and trial. He explained:

I could feel the pain before the chains were ever applied, and that is an hour or two hours before these chains were put on. I could feel those chains and the pain of it, two and three hours after they were removed when we returned to the prison. And in terms of pain, we are talking about 14 and 15 hours a day of having to deal with this. That consumed every aspect of my life at that point.

Spain claimed that the pain impeded his ability to concentrate on the trial proceedings. The issue of pain was relevant not only to Spain's ability to participate at trial and cooperate with his counsel, but also to Spain's decision not to testify at trial. Spain later testified about the effect the chains had on this decision. On redirect examination, Spain's attorney attempted to introduce the testimony Spain had given years earlier before Judge Zirpoli, the federal district judge in the 1983 action, and the government objected on relevancy grounds. The magistrate overruled the objection and admitted the evidence, explaining: "Well, it seems to me there is a certain amount of relevance with regard to the issue before me in the mere fact he testified before Judge Zirpoli when he was not shackled." [6]

In assessing the veracity of Spain's complaints of experiencing disruptive pain and humiliation during trial, the magistrate apparently factored in the extent and duration of the chaining as well. The magistrate devoted an entire section to this subject, methodically detailing the type, number, and weight of the chains Spain wore

---

6. The magistrate's basis for admitting Spain's former testimony indicates that she considered this evidence insofar as it was pertinent to Spain's decision not to testify. The dissent overstates the importance of this evidence to the magistrate's findings:

> For hard evidence as to the effect of the chains on Spain's health and on his ability to communicate with Garry and prepare his defense, the magistrate relied on Spain's own declaration in connection with his earlier habeas corpus petition and his testimony before Judge Zirpoli in that proceeding.

*Post,* at 734. The dissent then draws the following conclusion: "Spain's declaration and testimony in that proceeding are indeed the chief basis for the findings in the present case." *Post,* at 734. This is unsupportable. Apart from the magistrate's expressed understanding of the relevance of this evidence, this part of Spain's testimony occupied but five pages of a transcript that numbered more than 100 pages. Finally, the magistrate in no way suggested in her evidentiary report that she placed such emphasis on Spain's former testimony. The magistrate cited Spain's statements before Judge Zirpoli *only to establish his preoccupation with the subject of shackles.* Evidentiary Report, *supra,* at 8–9. The two citations are but facts showing that Spain was preoccupied. The magistrate adverted to other indications of preoccupation: Spain undertook a course of study of the history of shackling, and Spain focused first on his shackling in his personal statement to the sentencing court. *Id.* at 9. The government acknowledges this: "Appellant does not dispute the existence of the foregoing facts, for the record does establish that appellee complained about his restraints." Brief of Appellant at 38. Instead, the government disagrees that "the evidence proves an obsessive distraction which prevented petitioner from participating in his own defense." *Id.* The dissent also acknowledges Spain's preoccupation with the shackles: "What is most apparent in Spain's deeply felt and continuing complaint about the chains is that he perceived them as an affront to his dignity as a human being." *Post,* at 738.

and for how long. Of course, this is a reasonable consideration. The truthfulness of Spain's complaints must be gauged by the circumstances he suffered.

After thoroughly reviewing the magistrate's evidentiary report, we find no basis for disturbing her findings, having accorded them appropriate deference. Spain's story is "coherent and facially plausible." *Anderson*, 440 U.S. at 575, 105 S.Ct. at 1512. It is not implausible that a man shackled with 25 pounds of chains ten to twelve hours a day for almost five years would experience debilitating pain and degradation. Indeed, the government concedes that Spain's "physical ailments [were] ... painful," and only disagrees with the magistrate's conclusion that the pain was debilitating. Brief of Appellants 46; *see also id.* at 38–39. Nor is Spain's story "internally inconsistent" or "contradicted by extrinsic evidence." *Anderson*, 440 U.S. at 575, 105 S.Ct. at 1512.[7] All this is not to say that were we the magistrate we would have made the same findings. But what we might have done or not have done as factfinders does not matter. *Id.* at 573, 105 S.Ct. at 1511. Our inquiry is of a different order.

### III

A cumulation of factors, not just any single one, provided the trial judge in the case at bench with ample justification for taking some sort of action to protect the jury, the courtroom personnel, the spectators, the defendants, and himself. *See Zygadlo v. Wainright*, 720 F.2d 1221, 1223 (11th Cir.1983), *cert. denied*, 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984). On trial were six men, already serving time for committing acts of extreme violence, who were accused of perpetrating one of the bloodiest prison escapes of all time. The trial judge, therefore, undoubtedly was concerned that Spain might try to escape. *See United States v. Kress*, 451 F.2d 576, 577 (9th Cir.1971) (shackles may be necessary to prevent escape), *cert. denied*, 406 U.S. 923, 92 S.Ct. 1789, 32 L.Ed.2d 123 (1972); *United States v. Apodaca*, 843 F.2d 421, 431 (10th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988); *Zygadlo*, 720 F.2d at 1223. Adding to the judge's concern was the potentially explosive political atmosphere surrounding the trial[8] and a previous courthouse shoot-out involving Spain's accomplice Jackson that left three men dead, including the presiding judge.[9] Finally, Spain repeatedly interrupted the pretrial proceedings and often was sent to a holding cell where he continued to cause disruptions.[10]

We conclude that under these circumstances the trial court appropriately deter-

---

**7.** The dissent asserts that Judge Zirpoli's findings in the section 1983 action contradict the district court's adopted findings below, *post*, at 734, 735–36, and "bear heavily on the credibility of Spain's present contentions," *post*, at 734. We disproved this assertion in footnote 3. In that footnote, we established that Judge Zirpoli's findings are not inconsistent with the magistrate's, because the two factfinders were focusing on different constitutional inquiries. The dissent refuses to acknowledge this difference, and its inevitable ramifications. Furthermore, we cannot agree with the dissent's characterization of the scope of the inquiry before Judge Zirpoli. The dissent asserts that Spain complained to Judge Zirpoli that impermissible interferences with his right to effective assistance of counsel were "caused by the conditions of his confinement and by 'certain practices' of the defendants, including their use of chains." *Post*, at 734 (quoting *Spain v. Procunier*, 408 F.Supp. at 536). The phrase "including their use of chains" is the dissent's own extrapolation.

**8.** We note once again that Spain was affiliated with the Black Panther Party, a revolutionary movement that advocated violence as part of its political platform. *See supra* note 1. In deciding whether to secure the courtroom in some manner, the trial court properly considered this as a factor.

**9.** On August 7, 1970, during the murder trial of three San Quentin inmates, including George Jackson (the San Quentin prisoner and Black Panther leader who initiated the violence for which Spain was on trial), Jackson's brother entered the Marin County courthouse and took the trial judge hostage in an attempt to exchange hostages for the inmates on trial. Judge Harold Haley was killed in the parking lot during a gun battle between his abductors and the police. The proceedings in Spain's case, which also were held in the Marin County courthouse, began in 1971.

**10.** Spain interrupted the pretrial proceedings on the following dates:

mined that some measure was needed to maintain the security of the courtroom. The remaining inquiry, therefore, is whether the actual measure taken—shackling Spain—was constitutional.

## IV

An analysis of the trial court's decision to shackle Spain throughout his trial properly begins with the Supreme Court's decision in *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The Court used *Allen* as an opportunity to provide appropriate guidelines for maintaining judicial control of the courtroom. *Id.* at 351, 90 S.Ct. at 1064 (Douglas, J., dissenting). The Court provided that faced with a contumacious defendant, the trial judge has at least three constitutionally permissible options. He may "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." *Id.* at 343–44, 90 S.Ct. at 1061.

Upon discussing the possibility of binding and gagging a defendant, the Court admonished that this option should be employed only "as a last resort." *Id.* at 344, 90 S.Ct. at 1061 ("But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort.").[11] Numerous reasons were offered for holding that shackling and gagging be used only in extraordinary cases:

> Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total restraint.

*Id.*

■ The Court in *Allen*, therefore, identified three "inherent disadvantages and limitations" in this method of maintaining judicial control. The lower federal courts have observed two further weaknesses in imposing physical restraints: they may confuse and embarrass the defendant, thereby impairing his mental faculties; and

April 7, 1972: Spain was removed from the courtroom because he was interrupting the proceedings.

April 14, 1972: Spain and others were removed from the courtroom at 9:26 a.m. because of disturbances. They were brought back into court at 10:50 a.m. Spain and others were removed again at 11:17 a.m. because of further disruptions.

On either April 7 or 14, 1972, the district court noted that several defendants, including Spain, spat on the presiding judge.

May 12, 1972: Spain and others were removed because of disturbances.

May 11, 1973: Spain was in the holding cell at his request. His kicking the holding cell door interrupted argument.

June 1, 1973: Spain refused to enter the courtroom and was left in the holding cell. Later, he was joined by all the defendants. Loud noises from the holding cell interrupted court proceedings numerous times.

June 29, 1973: Spain refused to leave the holding cell to go to court. While he was in the cell with others, loud pounding from the cell interrupted the court.

July 27, 1973: Spain was in the holding cell on his own volition. He was heard shouting in his cell.

September 21, 1973: Spain requested to be removed from the court. After an outburst from Spain, the court recessed and had him put in the holding cell.

December 17, 1973: Spain was removed to the holding cell for persistently interrupting the court.

February 27, 1975: Spain and other defendants were in the holding cell. Loud pounding emanated from the holding cell and Spain requested a doctor. Forty-five minutes later more loud pounding interrupted the court. Later, three defendants including Spain were in the cell. The loud pounding drowned out the proceedings, compelling the court to remove the three to a more distant holding cell.

March 14, 1975: Spain ignored the court's repeated admonition to be quiet and the court ordered him removed.

11. In his separate concurrence, Justice Brennan noted his agreement with Justice Black's majority opinion that "these three methods are not equally acceptable." *Allen,* 397 U.S. at 350, 90 S.Ct. at 1064 (Brennan, J., concurring). "In particular," he continued, "shackling and gagging a defendant is surely the least acceptable of them." *Id.*

they may cause him pain. *See Zygadlo,* 720 F.2d at 1223 (shackles may impair mental faculties); *United States ex rel. Boothe v. Superintendent, Woodbourne Correctional Facility,* 506 F.Supp. 1337, 1340 (E.D.N.Y.) (pain may result from shackling), *rev'd on other grounds,* 656 F.2d 27 (2d Cir.1981). The list of problems that should be considered in a decision to shackle may be summarized as follows:

(1) Physical restraints may cause jury prejudice, reversing the presumption of innocence;

(2) Shackles may impair the defendant's mental faculties;

(3) Physical restraints may impede the communication between the defendant and his lawyer;

(4) Shackles may detract from the dignity and decorum of the judicial proceedings; and

(5) Physical restraints may be painful to the defendant.

*See Kennedy v. Cardwell,* 487 F.2d 101, 105–06 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974).

■■■ Because of the problems accompanying a decision to shackle, reviewing courts require that trial judges pursue less restrictive alternatives before imposing physical restraints. *See Woodard v. Perrin,* 692 F.2d 220, 221 (1st Cir.1982); *Kennedy,* 487 F.2d at 111; *Wilson,* 770 F.2d at 1486;[12] *Tyars v. Finner,* 709 F.2d 1274, 1284–85 (9th Cir.1983); *Elledge v. Dugger,* 823 F.2d 1439, 1452 (11th Cir.) (per curiam), *opinion withdrawn in part on other grounds,* 833 F.2d 250 (11th Cir.1987) (per curiam), *cert. denied,* —— U.S. ——, 108

S.Ct. 1487, 99 L.Ed.2d 715 (1988). In weighing the merits of physical restraints, the trial judge must consider the particularities of the case before him. *See Allen,* 397 U.S. at 343–44, 90 S.Ct. at 1060–61 (recognizing the need for an ad hoc approach to maintaining judicial control). The trial judge must assess the extent of the limitations that would be present if shackles were applied, taking into consideration the five potential problems listed above. The trial judge then must weigh the benefits and burdens of shackling against other possible alternatives.

## A

An analysis of the facts in the present case demonstrates that applying shackles to Spain throughout the entire trial presented many difficulties. The proceedings were unusually long and involved the simultaneous trial of six defendants. During the trial, each defendant was required to appear before the jury with numerous physical restraints.

### 1

■■■ It is axiomatic that our criminal justice system affords every accused individual a presumption of innocence. *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895), *cited in Kennedy,* 487 F.2d at 104. When an accused is forced to appear before his peers in chains, this presumption is seriously jeopardized. *See Holbrook v. Flynn,* 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986); *United States v. Samuel,* 431 F.2d 610, 614–15 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28

---

**12.** *Wilson* involved review of a decision denying the writ of habeas corpus. The court in its review noted: "Ultimately, however, it is incumbent upon the defendant to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them." 770 F.2d at 1486. The dissent quotes only the first half of this sentence and construes it as a statement of the burden of proof. The dissent concludes: "The burden was on Spain to produce the evidence to show whether absence as an alternative to shackling continued to be open to him." *Post,* at 738.

We read the full sentence in *Wilson* different-

ly. The court simply was restating the standard of review on appeal—abuse of discretion—and the concomitant burden this stringent standard placed upon the defendant. While we agree that the district court's basis for granting the writ was in error, we may affirm a judgment on any ground supported in the record. *See Pedro v. Oregon Parole Bd.,* 825 F.2d 1396, 1399 (9th Cir.1987), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988); *James v. Reese,* 546 F.2d 325, 327 (9th Cir.1976); *see also Dunne v. Henman,* 875 F.2d 244, 247 (9th Cir.1989); *Bowen v. U.S. Parole Commission,* 805 F.2d 885, 887 (9th Cir.1986).

L.Ed.2d 229 (1971); *Kennedy*, 487 F.2d at 104; *Apodaca*, 843 F.2d at 430–31; *Zygadlo*, 720 F.2d at 1223. Despite this hazard, shackling sometimes may be appropriate because of the public's competing interest in courtroom security and the just administration of law. *Allen*, 397 U.S. at 344, 90 S.Ct. at 1061.

The amount of prejudice that may flow from a decision to impose physical restraints is not constant. The degree of prejudice is a function of the extent of chains applied and their visibility to the jury. In other words, the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice. In the instant case, Spain was subjected to maximum restraints: he wore leg irons, a waist chain to which each hand was bound by individual chains about eight inches long, and chains that apparently held him to his chair. Moreover, the shackles were conspicuous; the jury was able to appreciate the full extent of the chaining. Given the number of defendants on trial in shackles, the extent of restraints, and the long duration of the trial, the trial judge was powerless to conceal the chains. In sum, shackling Spain in this manner exposed him to a serious threat of prejudice.

### 2

Another danger inherent in imposing physical restraints is the possibility that the defendant may feel confused, frustrated, or embarrassed, thus impairing his mental faculties. *Zygadlo*, 720 F.2d at 1223. Along with his habeas corpus petition in July 1975 to have the shackles removed, Spain filed a declaration in which he described the effects of his being physically restrained: "I get exasperated and cannot concentrate.... These shackles and chains must be removed." The magistrate below found that the subject of shackles practically consumed Spain's attention and significantly detracted from his ability to prepare for his own defense. Evidentiary Report, *supra*, at 8–10. The magistrate also noted that Spain went so far as to undertake a course of study of the history of shackling. Evidentiary Report, *supra*, at 9.

The state trial judge was on notice that the shackling might be having this effect on Spain. At various points Spain complained about the shackles and made motions to have them removed. On one occasion, on December 11, 1973, he filed a handwritten affidavit describing the toll exacted by the restraints, concluding: "[A]ll of the above is a severe physical and psychological strain. I have not been able to understand the court proceedings, in which I've been made to go through; I do not understand my attorneys...." Clerk's Transcript (CT) 2087.

### 3

"[O]ne of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total restraint." *Allen*, 397 U.S. at 344, 90 S.Ct. at 1061. While Spain was not gagged, he otherwise was totally restrained by the shackles. According to the magistrate's findings, the chains "grossly interfer[ed] with his ability to cooperate with counsel." Evidentiary Report, *supra*, at 12. This finding is consistent with the magistrate's determination that the chains seriously impaired Spain's mental faculties.

### 4

Perhaps the least weighty concern involved in deciding whether or not to shackle a defendant is the affront caused to the dignity and decorum of the judicial proceedings. *See Kennedy*, 487 F.2d at 106 n. 8 (concern about judicial dignity and decorum is based purely on policy and does not directly affect defendant). Nonetheless, this is yet another factor that the Supreme Court has suggested trial courts consider before making a shackling ruling. *See Allen*, 397 U.S. at 344, 90 S.Ct. at 1061.

It is hard to imagine a case in which the dignity and decorum of the judicial proceedings were disrupted more than they were in the present case. Not only was Spain extensively shackled, he stood trial

with five other defendants who were similarly restrained.

### 5

Long ago it was recognized that a high cost of shackling is the pain imposed and the consequential burden placed on the body and mind of the defendant. Coke, apparently paraphrasing (and expanding upon) Bracton, observed:

Bracton saith ... if felons come in judgment to answer they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason.... And in another place he saith ... It is an abuse that prisoners be charged with irons, or put to any pain before they be attainted.

3 Coke Inst. 34 (1797), *quoted in* Krauskopf, *Physical Restraint of the Defendant in the Courtroom*, 15 St. Louis Univ.L.J. 351 (1971). While today's shackles are themselves less painful than they were in Coke's day, *see Boothe*, 506 F.Supp. at 1340, they may inflict enough pain in certain circumstances to call into question the propriety of their use, *see United States v. Whitehorn*, 710 F.Supp. 803, 840 (D.D.C. 1989) (employing plexiglass partition instead of shackles, which are "obviously less desirable" because of their "punitive nature" and the long duration of pretrial confinement). Conceivably, in a given case the chains may be so numerous and the trial so lengthy that shackling is not a viable option.

This is such a case. Spain was heavily chained. The magistrate concluded that the total weight of the shackles was 25 pounds. In addition, the judicial proceedings were unusually long. The pretrial proceedings, during which Spain was restrained, lasted almost four years. The trial itself spanned seventeen months, almost a year and a half. Of course, the mere sight of the chains gave the trial judge some indication of their weight; and the trial judge realized at the outset that the trial would be lengthy.

Spain's complaints about the pain caused by the chains were immediate, chronic, and impassioned. He began to complain of pain soon after he was first shackled. At his arraignment on October 15, 1971, Spain requested the court to examine his wrists because his handcuffs were too tight. The court ordered the guards to inspect Spain's wrists and to loosen his handcuffs if necessary. Spain then asked to be unshackled; the court denied this request. On January 17, 1972, at a hearing on Spain's motion to have his assigned counsel replaced by counsel of his choice (which was denied), Spain requested that his chains be removed so he would be able to take notes. This request also was denied.

As the lengthy pretrial period continued, Spain's pain increased and his requests for unshackling grew more frequent and more urgent. At a May 11, 1973, hearing on another of Spain's motions to substitute counsel of his choice, Spain again complained of pain in his wrists. On June 1, 1973, Spain, now wearing bandages under his handcuffs, called the court's attention to the pain caused by his arm restraints. By November, Spain's condition had deteriorated markedly. He complained to the trial court that he was "physically unable and unwilling to endure the pain of the chains digging into [his] skin."[13] Spain's requests for unshackling and his complaints of pain continued. He complained of pain at a hearing on December 17, 1973. On January 11, 1974, Spain requested an opportunity to testify as to his pain and his deteriorating health. The court did not permit Spain to testify. On November 29, 1974, a doctor examined Spain after Spain reported rectal pain, lower back pain, and weight loss. The doctor recommended, in a report addressed to the Chief Medical Officer at San Quentin Prison, that Spain "in no event be chained during his trial, in view of the weight loss and the evidence of intestinal and/or nutritional disorder." CT 2508. The doctor's recommendation was ignored.

---

**13.** Spain lodged this complaint in a handwritten motion dated November 30, 1973, in which he sought to waive his right to be present at trial. The motion is quoted in full *infra*.

In the month before the beginning of trial, there was a rapid succession of pain reports and requests for unshackling. On February 11, 1975, at the request of Spain's lawyer, a second doctor examined Spain and recommended that the chains be removed because they were "aggravat[ing] the patient's back pathology." CT 2502. Spain refused to attend a February 21 hearing because he was suffering from constant pain. At a hearing on February 27, Spain's counsel advised the court that Spain was unable to sit without pain and accordingly was forced to either stand or lie down. On March 3, Spain requested to be removed from the courtroom because he was in pain. On March 4, the second doctor noted that the chains "may have been the stress which precipitated the onset of pain in a spine, which was already deformed. It is almost certain that a return to the Marin court, fettered as he has been in the past, would exert more stress on his injured back and aggravate his problem." CT 2499.

On March 10, Spain's counsel filed a declaration stating that Spain was unable to cooperate in his defense, because "most of the time, Mr. Spain has been either under heavy sedation, absent from the court room due to his inability to sit in the restraints, or in extreme pain both in and out of the court room." CT 2494–95. Apart from its response to the March 3 request for removal from the courtroom (which apparently was granted only as to that day), the court ignored Spain's complaints.

On March 18, 1975, one week before trial, Spain filed a handwritten affidavit summarizing his condition:

I, johnny larry spain, depose and say:
I That I have been advised by my attorney to state my reasons for waiving the right to be present at the hearing of March 18, 1975, and make this statement under the penalty of perjury. The major reasons are as follows:

A.) First and foremost, I have been continuously subjected to anywhere from 7 to 10 hours of being chained and shackled, sometimes to the floor (if in the holding cell), and always to a fixed position if in the courtroom, while most of the time being in pain and/or under heavy medication; in either instance I have found it almost impossible to understand the proceedings and the court has constantly refused to remedy (in fact, the court has profoundly imposed) the conditions under which I suffer pain as a result of multiple medical problems of the severe nature.

B.) Under the latter circumstances I do not feel it is worth chancing any further and perhaps irreversible physical damage to my person just to claim some phony "due process" rights, when, under the above circumstances, "due process" really means being subjected to pain in a sham and mockery of justice.

C.) I have been examined by private doctors—Dr. Betty Jo Smith, who is a surgeon in chief; Dr. Peter La Riviere, and Dr. Corey Weinstein—and all the doctors have made reports that clearly indicate (or rather specifically state) that my being chained and shackled and otherwise subjected to the conditions which exist in the court building in Marin county, for the defendants in People vs. Bingham, are necessarily harmful to my already bad health condition.

D.) I have requested medical attention from the prison medical staff for specific problems and I have been denied any medical attention at all in specific instances, particularly regarding the severe pain in the sciatica (right side) area. I have been given shots in my back (from my shoulders to my lower back) by Dr. White, a prison doctor, and these shots were specifically for the pain I'm having in my back, and yet the prison claims that there is "nothing wrong" with me, and the court claims there is "nothing wrong" with me, but that is an idiotic supposition simply because one does not receive shots unless *something* is wrong with a person. Moreover, the shots have become increasingly ineffectual for the purpose which they are supposed to serve. The court's position (which is always the prison's position) is obviously biased.

II  That the above are the major reasons I do not wish to be present at the hearing on March 18, 1975, which means, in sum: that I'm forced to select "due process" or severe pain, both of which mean the same thing in the case of *People vs. Bingham*.

. . . .

/s/johnny larry spain

CT 2635–36 (emphasis in original). On March 24, the day before trial, the court denied the defendants' motions to be unshackled at trial.

Spain's condition did not improve. On July 23, a third doctor, who conducted an examination when Spain was taken to San Francisco General Hospital for evaluation of weight loss, abdominal pain, rectal bleeding and lower back pain, recommended "that the patient be permitted adequate exercise and more importantly that he not be restrained with chains for court appearances which will aggravate his chronic back problem." CT 4461. This doctor's report, like those of the two doctors before him, was ignored by the court. On July 24, Spain once again filed a declaration attesting to his pain:

By order of the trial Judge, I am shackled and chained to my chair like a wild animal.

I am in constant pain and discomfort. After sitting in the stationary manner for a period of twenty minutes, I am just beside myself. I get exasperated and cannot concentrate and get to the point of complete emotional breakdown.

At one time, when the jury was chosen in the case, at approximately 4:00 p.m. I was so distraught with pain and the thought of having to endure a period from six months to nine months was more than I was able to endure. Without thinking, and in complete frustration, I threw my files. I know I meant no harm to anyone.

These shackles and chains must be removed. I cannot endure the pain. If I were permitted to stand up and move my body for a moment or two every fifteen or twenty minutes, then I could endure the trial. Otherwise, I am not able to do so.

I make this promise to the Court that, if the chain and shackles were removed and I could sit in that Courtroom as a human being instead of a wild animal, my conduct would be more than exemplary.

. . . .

/s/ johnny larry spain

CT 4459–60. Like all others, this plea was ignored.

In sum, Spain repeatedly voiced his complaints of pain, which were corroborated by uncontested medical reports. The magistrate, after an evidentiary hearing, concluded that the pain was real and substantially interfered with his ability to participate in his own defense.[14] On the present state of the record, we have no basis for contesting this finding.

**B**

The decision to shackle Spain throughout the trial in order to maintain courtroom security clearly posed many serious drawbacks. All the limitations and disadvantages that accompany a decision to impose physical restraints were maximally present in this case. As a result, the trial court abused its discretion if there was available any option that did not present the same dangers. *See Allen*, 397 U.S. at 344, 90 S.Ct. at 1061.

The dissent accuses us of substituting our discretionary judgment for that of the state trial court. *Post*, at 739. This is not so. The state trial court simply did not exercise its discretion; it completely ignored Spain's complaints of pain and thus did not assess the factor of pain in making its shackling ruling. Under these circumstances, we are not second-guessing the informed judgment of the trial court, but making a constitutional judgment where the state trial judge failed in his duty to do so.

**14.** The state trial court unfortunately never bothered to conduct an evidentiary hearing to explore this problem. When a shackled defendant complains of pain, the trial court is not free to ignore it. Instead, the court must ascertain the legitimacy of those complaints and then consider the feasibility of shackling as an option. In the ordinary case, imposition of shackles is not likely to cause much pain to the defendant. This is no ordinary case.

### 1

The trial court never really considered the alternatives to shackling the defendants in order to secure the courtroom. Instead, the court believed the solution was to be found between the two extremes of total restraint and total freedom from shackles. The court revealed its mindset on January 11, 1974, when it stated: "I have to consider all of the options from the total release of restraint to continuation of the existing restraint." In its March 24, 1975, order denying the motion for unshackling, the court once again exposed its limited focus: "The Court has considered every possible opportunity between freeing all or some inmate-defendants entirely from restraint, to full restraint for all inmate-defendants." These statements make it plain that the trial court actually did not consider "all of the options." Rather, it considered only the options involving the degree of shackling.

The *Allen* decision suggested at least two other possible options *other than shackling:* a trial court could cite the defendant for contempt; or it could remove him from the courtroom and conduct the trial in his absence.[15] Because Spain was serving a life sentence for first degree murder at the time of the trial, citing Spain for contempt would have been meaningless. Hence, this suggested alternative to shackling was not feasible in the context of this case. However, the same cannot be said of excluding Spain from trial.

### 2

An accused has a well-established right to be present at his own trial. *Badger v. Cardwell*, 587 F.2d 968, 970 (9th Cir.1978). Ordinarily, his presence secures other fundamental guarantees—the right to confront witnesses, the right to help prepare his own defense by assisting counsel during trial, the right to listen to testimony, and the right to testify on his own behalf.

*See United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) ("The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *e.g., Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him.") (per curiam); *Badger,* 587 F.2d at 970–71; *United States v. Latham,* 874 F.2d 852, 856 (1st Cir.1989).

Nevertheless, removing the defendant from trial may be a permissible option in certain cases. *Allen,* 397 U.S. at 343–44, 90 S.Ct. at 1060–61. Indeed, the Court in *Allen* specifically noted that removal from trial in some instances may be a preferable alternative to shackling and gagging. After discussing the drawbacks associated with shackling and gagging, the Court concluded:

> It is in part because of these inherent disadvantages and limitations in this method of dealing with disorderly defendants that we decline to hold with the Court of Appeals that a defendant cannot under any possible circumstances be deprived of his right to be present at trial.

*Id.* at 344, 90 S.Ct. at 1061.[16]

### 3

On several occasions, Spain raised the possibility of being absent from trial. In a handwritten motion filed on November 30, 1973, Spain requested that he be permitted to remain at San Quentin rather than to be transported to the courtroom in pain:

> Motion by johnny larry spain:
>
> I  I would now like to move this court for an order allowing me to remain at San Quentin Prison rather than be brought to this courtroom.
>
> II  I am often chained for 9 or 10 hours a day while in court and I am physically

---

**15.** Recently, in *Stewart v. Corbin,* 850 F.2d 492 (9th Cir.1988), we reviewed a trial court's decision to shackle and gag the defendant. In applying the least restrictive alternative analysis, we inquired whether citing the defendant for contempt or expelling him from trial were feasible options and concluded that they were not. *Id.* at 499–500.

**16.** The Court in *Allen* upheld the trial court's decision to expel the defendant from trial.

unable and unwilling to endure the pain of the chains digging into my skin, and of having blood-flow infringed upon by my being chained in a manner such as *would and does* keep me in a fixed position.

III Per paragraph "II," I'm under physical compulsion to make a decision, a choice between being in utterly unnecessary pain or giving up constitutional rights.

I give them (the rights) up

/s/ johnny l spain

CT 2078. The court never ruled on Spain's request; he continued to be shackled and brought to the courtroom daily.

Spain renewed his request to be absent from the trial at a pretrial hearing on January 11, 1974. During the hearing, the court and Spain's counsel addressed the issue of shackles. The court inquired whether Spain would be satisfied if the manacles were removed, while leaving the other chains in place. Spain's counsel responded:

I can tell you this: My client told me ... that in the event that there is any shackling whatsoever, any restraint where he cannot have even the semblance of a fair trial, he does not care to come into this courtroom. He does not care to come into this building, and he would just as soon remain in his cell at San Quentin, because that's what he has told me to do.

He has ordered me to proceed in that regard, and I have tried to convince him that at least we get these pretrial matters over with and probably we can have

an atmosphere that we can really work in. I have made that assurance to him.

Now, he has told me unequivocally without any reservation that if there is any form of restraint in the courtroom where that jury looks upon him as though he is a demon, that he will not come into the courtroom or he will not come into the building at all. He will not go into the holding cell. He will remain in San Quentin where he's housed now.

I just want your Honor to know that that is the transmission that Mr. Spain has given to [me].

R.T. 2949–50.

On April 11, 1975, Spain once again raised the possibility of being excluded from trial instead of appearing in shackles. In a handwritten affidavit, Spain attested that he had signed a "Waiver of Defendant's Personal Presence" because of the physical and psychological duress imposed by the chains. CT 2861. He claimed that he was "not physically able to stand trial according to doctors and specialists who examined [him]" and that the chains subjected him to "severe back pain," "severe pain in the right sciatica nerve," and "muscle cramps, spasms, and pulled muscles with increasing frequency." Further, he alleged that "[t]he shackles and chains cause[d] [him] to be of little or no assistance in [his] defense ... because [he could not] concentrate while in pain and, thus, most of the time [he could not] follow the proceedings in the case." [17] *Id.* at 2861–62. The court conducted a hearing concerning this matter and concluded that Spain may be excused from personally appearing during pretrial matters, but not during jury selection or the trial.[18] CT 2882. Accord-

---

**17.** The prosecution opposed this motion, arguing that the waiver was not a voluntary relinquishment of his rights because Spain stated that he was being forced to choose between shackles and his presence at trial.

We disagree. Unquestionably, Spain confronted a choice: either remain at trial with physical restraints or be absent from trial. It is critical, however, that this choice was not unlawfully imposed. Spain himself, not the trial court, was the cause of his dilemma. That is, the violent nature of the crimes charged, the political atmosphere surrounding the case, and Spain's disruptive conduct prompted the trial

court to take some action to secure the courtroom. Under these circumstances, appearing at trial wholly unfettered was not feasible. Thus, some form of shackling and removal from trial were among the options to be *considered*. A deliberative decision among unpleasant choices does not render the decision involuntary. *See Brady v. United States*, 397 U.S. 742, 749–50, 90 S.Ct. 1463, 1469–70, 25 L.Ed.2d 747 (1970) (defendant's guilty plea, even if entered to avoid possibility of death penalty, was voluntary).

**18.** At the hearing on April 11, 1975, the court explored the scope of the requested waiver, which from the affidavit appeared to cover the

ingly, Spain was forced to attend the trial for seventeen months in a physically and mentally debilitated condition.

### 4

We conclude that Spain gave the trial judge the option of excluding him from trial. Exclusion from trial would have been a less restrictive alternative. At a minimum, Spain would have been better able to assist in his own defense. Without the chains, he would not have experienced the pain and humiliation that the district court concluded prevented him from meaningfully participating in aiding his counsel. At least two of the five drawbacks associated with a decision to shackle, therefore, would have been eliminated. At the same time, courtroom security would not have been jeopardized in the least.

The trial court also might have had an alternative short of total exclusion; the court might have allowed Spain to be absent on selected days when he was not feeling well. Perhaps with limited periods of rest without being shackled, Spain could have endured the days of trial in physical restraints. Spain fairly raised this possibility, but the court failed to explore it.[19]

Consequently, the trial judge committed constitutional error[20] in failing to employ shackling as a "last resort."[21]

### V

Due process requires that shackles be imposed only as a last resort. In determining whether shackling is a last resort, a trial judge must consider the benefits and burdens associated with imposing physical restraints in the particular case. If the alternatives are less onerous yet no less beneficial, due process demands that the trial judge opt for one of the alternatives. In the present case, which is unparalleled in the extent and duration of shackling, the trial judge failed to employ the less restrictive alternative of excluding Spain from trial. This failure deprived Spain of his right to due process.[22] The district court's

---

entire trial. Initially, Spain's counsel was unsure and sought to have Spain testify to the extent of the request. The court would not permit Spain to testify. Spain's counsel then stated that his client wished to be able to waive his presence on selected days when he was not feeling well. The court refused to allow Spain to execute a waiver once trial had begun, stating: "Once the evidence commences, it would seem to me that there is no way that he can waive his personal presence." [R.T. 5194–95]

This exchange between the court and counsel is noteworthy for two reasons. First, the trial judge incorrectly believed that Spain could not waive his right to be present at trial. *Allen* specifically provides removal from trial as a possible alternative to shackling. To the extent that California law prevents absence from trial in this case and absence is less restrictive than shackling, federal law must prevail. U.S. Const. art. VI, cl. 2. Second, it would appear that Spain was not seeking to effectuate a complete waiver of his presence from trial. However, Spain may have been capitulating to the trial judge's view of the law. That is, at the outset of the April 11th hearing, the court made it clear that Spain could not be absent during the trial. Spain then limited the scope of the waiver, which in his affidavit seemed all encompassing. See CT at 2861 ("I am not physically able to stand trial....").

**19.** The record indicates that despite the trial court's ruling that Spain must attend trial, Spain refused to appear in court on a couple of occasions. CT 3405; 4006. However, there is no indication that this very brief absence served to alleviate the pain Spain suffered throughout his long trial.

**20.** Our conclusion is that the state trial court committed constitutional error, not torture. We disagree with the dissent's contrary reading of the majority's position. *Post,* at 735, 738. A defendant's right to due process may be violated even if the shackles impose mental and physical pain short of torture.

**21.** There was perhaps another less restrictive alternative: the reduction in the number of the chains, which would have alleviated Spain's pain and concomitant mental impairment. The trial judge never pursued this possibility, perhaps because he believed that Spain was taking the position that either all or none of the chains be removed. However, the trial judge could have rejected this position and reduced the number of the chains by concluding that Spain's constitutional right to a fair trial so demanded.

**22.** The dissent speculates that had the trial court granted Spain's wish to be absent from trial, Spain's habeas claim instead would be that he was deprived of his sixth amendment right of confrontation and his right to confer with counsel. *Post,* at 738. Perhaps this is true. However, this in no way detracts from our holding. Of course, there are many cases in which the exercise of a trial court's discretion will result in

decision to grant the writ of habeas corpus is therefore AFFIRMED.

NOONAN, Circuit Judge, dissenting:

With the greatest respect I differ from my colleagues in the conclusion they have reached. The case has been a difficult one for all of us and has required extensive deliberation. The very difficulty of the case points to the conclusion that we are not in an area where the Constitution of the United States mandates a result but in an area where a federal court is wrongly substituting its discretion for the discretion conscientiously exercised by the court that tried Spain for murder and convicted him of two murders.

### THE TASK OF THIS COURT

The only ground on which a federal court may invalidate a conviction in a court of one of the states is that the state in obtaining the conviction violated the Constitution of the United States. We have no jurisdiction as a federal court to substitute our discretion for that of a state trial judge. Only if some action by that judge in the exercise of his discretion is so outrageous a departure from the requirements of fair play that the defendant has been denied due process of law are we entitled to set the trial verdict aside. The question before us is not whether the trial judge has abused his discretion but whether he abused it so badly that Spain did not receive a fair trial or was denied his right to counsel.

The constitutional standard is set out in the leading case on this subject, *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Justice Black there begins his statement of the case by referring to the requirements of set by the Sixth Amendment and, in invalidating the state process, Justice Black concludes that the defendant indeed was denied a right guaranteed by the Sixth and Fourteenth Amendments. *Id.* at 346, 90 S.Ct. at 1062. The same standard is evident in our most recent case on the subject, *Stewart v. Corbin*, 850 F.2d 492, 497 (9th Cir.1988), *cert. denied*, 109 S.Ct. 1737, 104 L.Ed.2d 175 (1989), where the court says: "The issue in the present case is not whether in retrospect, the trial court could have handled the matter better, but rather, whether the trial court denied appellant a fair trial under the circumstances." Similarly in *Harrell v. Israel*, 672 F.2d 632, 637 (7th Cir. 1982), the court balances the prejudicial effect of shackling against the danger of a prisoner in a maximum security prison engaging in violence in a courtroom and concludes that the prisoner "suffered no denial of due process." That is the constitutional issue we have to decide.

It is true that talk of abuse of discretion has entered the cases. Perhaps the origin of this talk is the careless headnote using this language in *Illinois v. Allen*, 397 U.S. at 338, 90 S.Ct. at 1058. The basis of the headnote is Justice Black saying at 347: "There is nothing whatsoever in the record to show that the judge did not act completely within his discretion." But this unnecessary dictum was not the way Justice Black had formulated the question before the court. In *Woodard v. Perrin*, 692 F.2d 220, 222 (1st Cir.1982), the court manages to put the two standards as alternatives, finding that the state judge did not abuse his discretion and alternatively that the judge did not deny the defendant a fair trial. Finally, the erroneous standard crept into our circuit in *Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir.1985), where it is stated baldly: "We review a trial court's decision to use shackles under an abuse of discretion standard." *Woodard* and *Harrell* which are cited in support of this statement do not in fact support it. If there was any argument that we are still bound by the erroneous statement of the standard we are now liberated by the correct phrasing of it in *Stewart*.

Our task is to determine whether the right of counsel was denied and whether a

an appeal, no matter how that discretion is exercised. In the present case, if the trial court had determined that shackling Spain was not a feasible alternative and that granting Spain's

request to be absent from trial was the least restrictive alternative, an appeal based on his absence would be meritless.

fair trial under the circumstances was denied.

## THE DUE PROCESS BALANCING REQUIRED OF THE TRIAL JUDGE

The court that tried Spain was required to balance the danger to the court of not shackling him against the prejudice and harm that would result to him from shackling. To appreciate the situation in which the trial court found itself, consideration must be given to the context provided by Spain's membership in the Black Panther Party, by Spain's own history of violence against law enforcement officers, and by the murder of a Marin County trial judge and the kidnapping of the judge, the prosecutor and three jurors that had been carried out by Panthers in 1970 in the same Marin courthouse in which Spain went on trial.

*The Black Panther Party.* Here is not the place to attempt a definitive assessment of the aims and methods of the Black Panther Party. The view that it was the target of official surveillance, provocation and persecution has been frequently stated by its members and sympathizers. Here we only consider the prevalent official view of the Black Panther Party that a reasonable judge would have had to take into account in considering what Spain might do in his courtroom.

The most famous Black Panther slogan, known to everyone at the time, was "Off the pigs." It was generally understood that these words meant, "Kill police officers." *See, e.g.* "Gun–Barrel Politics: The Black Panther Party, 1966–71", Report by the Committee on International Security, House of Representatives, H.R.Rep. 92470, 92nd Cong., 1st Sess., 43 (1971). The Party aimed at making a revolution. The Party emphasized armed struggle and guerilla warfare. The Party planned violence, incited terrorism and spread inflammatory rhetoric designed to encourage homicidal assaults upon the police. *Id.* 133–35. The articles and cartoons of the party publication reflected a "continuous endorsement of the physical extermination of police officers." *Id.* at 34. Cartoons in this publica-

tion graphically demonstrated panthers attacking pigs in police uniforms and actually killing them. *Id.* at 37. A virus of violence had been released in the community.

*Spain's Own History.* In 1967 at the age of 17, Spain committed a robbery and in cold blood murdered a man with whom he had no previous relationship. *People v. Gray,* 263 Cal.App.2d 692, 69 Cal.Rptr. 751 (1968). Convicted of this murder, he was confined to Soledad Prison. *Spain v. Procunier,* 408 F.Supp. 534, 539 (N.D.Cal. 1976), *modified in part, aff'd in part, rev'd in part,* 600 F.2d 189 (9th Cir.1979) (Kennedy, J.). While Spain was in Soledad, a prominent Black Panther, George Jackson, and others, not including Spain, were indicted for the murder of Officer Mills within the prison. *Id.* at 540. Jackson was transferred to San Quentin. *Id.* Spain, viewed as a trouble-maker for his militant views, was also transferred to the Adjustment Center at San Quentin. *Id.* at 539. The Adjustment Center is still known as the place where the most violent inmates are kept. *People v. Wright,* 48 Cal.3d 168, 214, 255 Cal.Rptr. 853, 768 P.2d 72 (1989).

On August 21, 1971 Jackson took over the cell block with a weapon. He and his confederates in the space of one-half hour then murdered three bound and helpless officers, Jere Patrick Graham, Paul William Kresnes and Frank DeLeon, and two fellow prisoners, Johnny Lynn and Ronald Kane. They also cut the throats of, but did not succeed in killing, Officers Breckinridge and Rubiaco. Spain was one of Jackson's confederates. *Spain v. Rushen,* 543 F.Supp. 757, 760 (N.D.Cal.1982), *aff'd without opinion,* 701 F.2d 186 (9th Cir.), *vacated on other grounds, Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (plurality opinion). He had conspired with him to make the escape, secreting an escape map and ammunition in the cell. At the time Jackson took over the cell block he gave Spain an explosive that Spain still carried when he was recaptured. The events were front page news, San Francisco Sunday Examiner & Chronicle, Aug. 22, 1971, at 1, col 1, and made an indelible impression on correctional authorities, on

law enforcement officers, and indeed on anyone concerned with law and justice in the United States. The impression reinforced another indelible impression made a year earlier in the Marin County Courthouse.

*The 1970 Murder of the Trial Judge, the Maiming of the Prosecutor, and the Kidnapping of the Jurors.* On August 7, 1970 James McClain was on trial in the Marin County Courthouse before Judge Harold J. Haley. The offense charged was stabbing a San Quentin officer with a knife within the prison. McClain conducted his own defense, calling a number of fellow prisoners as witnesses. According to the Marin Independent, August 7, 1970, p. 4 the judge had ruled that McClain should not be chained lest the jury be prejudiced. In the middle of McClain's case, Jonathan Jackson, George Jackson's brother, entered the courtroom and took command of it with guns. According to the New York Times, August 16, 1970, he was to be eulogized for his actions as a "courageous revolutionary" by the Black Panther Minister of Defense.

According to the San Francisco Chronicle, August 8, 1970, at 1, col. 8, Jackson shouted, "This is it, gentlemen. Everybody freeze." The courtroom became his. He gave one prisoner-witness a revolver, another prisoner an automatic pistol, and McClain a sawed-off shotgun; he himself kept a carbine. The armed men then kidnapped Judge Haley, Assistant District Attorney Gary W. Thomas, and three women jurors, binding them with wire and forcing them out of the courtroom, into a parking lot near the courthouse, and into the rear of a van in the lot. The shotgun was strapped to the judge's throat. Thomas attempted to escape and was shot and wounded so as to be paralyzed for life. Juror Maria Graham was shot in the right arm. Juror Joyce Rodoni was hospitalized for shock. Two of the prisoners and Johnathan Jackson were shot and killed. Half of Judge Haley's face was blown off by his captors; he died instantly.

Circumstantial evidence existed that Jonathan Jackson had not acted alone in planning the invasion of the courtroom. The State of California had sufficient evidence to obtain an indictment of another, not yet in custody, for aiding and abetting. Similarly, the state had sufficient evidence to obtain an indictment of a different person as the coconspirator of George Jackson and Spain, not yet in custody but involved in aiding their planned escape from San Quentin. At the time of Spain's trial for murder it was not unreasonable for the trial judge to believe that there were conspirators at large capable of attempting his rescue by similar violence.

*The Continuing Dangers.* The trial judge made plain that the subject of changing the condition of restraints was "constantly" in his mind. He looked for the "hoped-for opportunity to change the condition of restraint." The reason that he did not change his mind was that a stream of incidents—a number of which he did not make public, lest the publicity prejudice the defendants—was brought to his attention which made him unwilling to risk the security of his courtroom by relieving Spain and his codefendants of their restraints.

The remarkable ability of prisoners to cause serious harm to guards and to other prisoners in the twinkling of an eye and with the most ordinary utensils or articles of furniture has been vividly set out in *Bruscino v. Carlson,* 854 F.2d 162, 165 (7th Cir.1988). Light bulbs, mop wringers, sharpened tooth brushes, sharp pencils and bare hands have all been employed by prisoners held within a maximum security prison to maim or to kill. *Id.* What could be done in a prison could be done in a courtroom by a prisoner not merely ill-disposed to the system but actually a member of a revolutionary group committed to the use of violence—a prisoner who would not be deterred by any prospect of increased prison time, a prisoner whose indictment for murder of prison guards reflected at least probable cause that he was capable of the most extreme violence. The judge who tried Spain knew what had happened to the prosecutor and to the jury and the judge who had tried James McClain. The judge had to balance the danger present in this extraordinary context against what chaining would do to Spain.

## THE EFFECTS OF THE CHAINING

An evidentiary hearing was held in connection with the present petition. Charles S. Garry, Spain's former counsel, testified that Spain was so preoccupied with the chains that "we weren't able to discuss another solitary thing." Spain, he stated, was "not mentally, emotionally, or in any other way in the courtroom. I had no attorney-client rapport or relationship with him." There was, Garry testified, "No way in the world I could communicate with him." He also testified that on the basis of Spain's complaint about the effects of the chains, he filed a petition for habeas corpus during the trial with the California Court of Appeals. The petition was denied.

Dr. Delman was a psychologist who saw Spain four times seven or eight years after the trial. He reviewed Spain's prison psychiatric file but did not speak to any correctional officers, prison officials or persons on the side of the prosecution. He interviewed only Spain, his friends, and his supporters. He testified on the basis of this research that "Spain was so depressed and pessimistic and beaten by the chains, that I don't believe he was capable of cooperating in a reasonable way."

Dr. Sutton, a staff psychiatrist at San Quentin, had examined Spain before and at the time of the trial. She testified that his health problems were minor, that he was suffering from neither psychiatric disease nor clinically-recognizable depression at the time of trial, and that the shackles were no substantial impediment to his cooperating with counsel or testifying at the trial.

Spain himself testified that he suffered pain throughout the trial, that his waist was rubbed almost raw by the chains, that he suffered headaches, hemorrhoids, back pain, and loss of weight. He stated that he did not testify at the trial because he did not see how he could be believed by the jury if he was in chains.

Spain also testified that the state had provided him with valium for his headaches and that he did not use all the tablets provided but had secreted 177 pills. He did not deny that he had been examined by Dr. William Clark on March 21, 1975 and pronounced to be "in perfect health." He also testified that the state provided him with a rubber cushion he could sit on after the state had, before the trial, provided him with surgery for his hemorrhoids. On cross-examination he testified he did not know what caused the hemorrhoids or his back problems.

As to his communications with his counsel, Charles Garry, he testified that he discussed with Garry his defense that he blacked out at the time of the murders; that he discussed with Garry various testimony at the trial against him offered by prison guards; that he discussed with Garry the incriminating evidence found in his cell after the murders; and that he had seven or eight investigators working for him and conferred with some of the investigators and with Garry as to his defense.

Spain's counsel in this proceeding introduced transcripts of an earlier federal habeas corpus proceeding before Judge Zirpoli, held while the Marin murder trial was in progress. Counsel for Spain directed his attention to the testimony Spain had then given as to damages the chains had done to his wrists and to his testimony in that proceeding that he had been unable to talk about his case confidentially to his attorney. Spain read into the record his testimony before Judge Zirpoli that the chains made him feel that he was having to prove he was a human being.

At the conclusion of this evidentiary hearing the magistrate made certain findings. Citing the incidents already quoted of Garry's testimony, she found that it was "marked by hyperbole" but nonetheless gave it some discounted weight. She accepted him as an expert in the field of criminal defense and his testimony in that role that only exceptional circumstances, not present here, would have led him not to have put Spain on the witness stand. She recited the conflicting testimony of the psychologist and psychiatrist and found the value of their opinions to be "limited." She proceeded to evaluate the effects of the shackling.

In making this evaluation the magistrate began with a statement from a California case that shackling "inevitably tends to confuse and embarrass the defendant and thereby materially to abridge and prejudicially affect his constitutional right of defense." She explicitly found that, contrary to Garry's testimony, Spain was not entirely "out of it." But she went on to say, "The evidence before us clearly establishes that the shackling preoccupied Spain during the trial." As evidence she then cited Spain's declaration filed in July 1975 with his habeas corpus petition in the federal court and his testimony before Judge Zirpoli in that proceeding on being made to feel non-human. She ended up concluding that the chains "were a significant factor in inhibiting Spain's ability to cooperate with his counsel." Her conclusion coincided with her starting point in the California case she quoted.

The magistrate also assessed the effects of chains on Spain's decision not to testify. The state took the position that the evidence was such that he would have gained nothing by testifying. The magistrate declined to review the evidence. Instead she concluded that, as the chains interfered with his ability to cooperate with counsel, they also must have effected his decision-making as to testifying. These conclusions of fact are very little different from the magistrate's starting point in the California case that said shackles "materially abridge and prejudicially affect the constitutional right of defense."

In a separate section entitled "Findings of Fact," the magistrate concluded:

1. Petitioner's shackling at trial aggravated his existing medical and psychological problems, and pained and preoccupied him during that time.

2. Petitioner's shackling interfered with his ability to communicate with his trial counsel and to participate in the preparation of his own defense.

3. Petitioner's shackling impeded his ability to testify on his own behalf.

The district court reviewed the magistrate's report but did not take new evidence and so was dependent on the magistrate's findings of fact. The district court, however, paraphrased Finding 2 of the magistrate as a finding that "petitioner was so preoccupied by the chains that he was unable to cooperate with his attorney during trial." As the basis for this conclusion the district court quoted Spain's 1975 habeas corpus petition and his testimony before Judge Zirpoli. As to Spain's ability to testify, the district court concluded: "Not only did the shackling unconstitutionally place on petitioner the burden of proving his innocence as discussed in Part A above, but at the same time it deprived him of his ability to do so." In support of this statement the district court noted that it was Spain's "preoccupation with the shackles and his medical problems" that made him unable to testify while his chained codefendants did testify.

As an appellate court we review the findings of fact of the district court under Fed.R.App.P. 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard should be given to the opportunity of the trial court to judge the credibility of the witnesses." Review of factual findings is for clear error and when findings "are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court findings." *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

However, a trial judge may not "insulate his findings from review by denominating them credibility determinations.... Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. Where such factors are present, the court of appeals may well find clear error even in the finding based on a credibility determination." *Id.*

*Anderson* is carefully crafted to require deference from the appellate court but does not relieve that court from "its responsibility to correct findings of fact when it is left 'with a definite and firm conviction that a mistake has been committed.' " *See Goodman v. Lukens Steel Co.,* 777 F.2d 113, 128

(3d Cir.1985) (quoting *United States v. United States Gypsum*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). There are occasions when focus on the evidence will leave the firm conviction of error on the part of the appeals court, *e.g.*, *Goodman* at 129. A trial court, for example, is not free to accept testimony from a witness without regard to that witness' "obvious bias." *Henson v. CIR*, 835 F.2d 850, 853 (11th Cir.1988). As *Anderson* itself pointed out, if a witness' statements are internally inconsistent the witness does not have to be believed.

In this case the magistrate heavily discounted the testimony of the psychologist and the psychiatrist and applied the gentle term "hyperbole" to statements of Charles Garry which were wildly improbable, contradicted the statements of Spain himself, and deprived Garry of any pretense of being an objective and reliable witness. For hard evidence as to the effect of the chains on Spain's health and on his ability to communicate with Garry and prepare his defense, the magistrate relied on Spain's own declaration in connection with his earlier habeas corpus petition and his testimony before Judge Zirpoli in that proceeding. The district court used the same evidence in its findings on this subject.

The evidence on which the magistrate and the district court relied was, therefore, documentary evidence—not live testimony where demeanor and inflection are important, but pieces of paper recording words which we can review as well as the district court, using the clear error standard of review of what the district court has found as fact. The transcript of the habeas corpus petition before Judge Zirpoli was introduced into this case. Spain's declaration and testimony in that proceeding are indeed the chief basis for the findings in the present case. We are equally free to take judicial notice of the judicial findings made in that proceeding.

The proceeding before Judge Zirpoli was directed against the state director of corrections, the warden of San Quentin, and certain correctional officers at San Quentin. *Spain v. Procunier*, 408 F.Supp. 534.

Spain, along with Hugo Pinell, Fleeta Drumgo, Luis Talamantez, David Johnson, and Willie Tate challenged their confinement in the Adjustment Center in San Quentin; attacked practices of the defendants interfering with their right of access to effective assistance of counsel and access to the courts; and complained of a lack of adequate medical care and other repressive measures detrimental to their physical and emotional health. *Id.* at 536. Evidentiary hearings, lasting 29 days, were held on their allegations. District Judge Zirpoli gave his decision on January 14, 1976 and modified it February 10, 1976. At the time of Judge Zirpoli's decision, Spain had been on trial in the Superior Court of Marin County since March 1975.

Spain explicitly claimed impermissible interferences with his right to the effective assistance of counsel and his right of access to the court. The interferences, he contended, were caused by the conditions of his confinement and by "certain practices" of the defendants, including their use of chains. The issues litigated between Spain and defendants in the case were decided against Spain. Judge Zirpoli explicitly ruled:

> It is evident from this very case and the evidence submitted in these proceedings that plaintiffs have had and continue to have effective assistance of counsel and access to the courts. *Id.* at 546.

Judge Zirpoli, who was not insensitive to the complaints of Spain and his fellow petitioners, ordered that neck chains not be used and that any other mechanical restraints, except handcuffs, not be used unless the prisoners presented "an actual or imminent threat of bodily harm or escape." *Id.* at 547. The order applied both to Spain's treatment in San Quentin and to his treatment at the murder trial. Nonetheless, after entering this broad order, Judge Zirpoli explicitly modified it to say that it did not apply "to the state trial proceeding in the courthouse, in the courtroom in Marin County."

These rulings, made after hearings in federal court contemporaneous with the Marin murder trial, bear heavily on the

credibility of Spain's present contentions. He was found able to have the effective assistance of counsel. He was found to have access to the courts. He failed to show that he was being denied due process of law by the state of California. With full opportunity to challenge the conditions to which he was subject at the time, he was unable to show that the state had an obligation under the Constitution of the United States to remove the chains because they interfered with his right of access to the courts or his right to counsel.

It is pure speculation to suppose that *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971) inhibited Judge Zirpoli from ordering the chains off during the trial. *Younger* abstention is not absolute. Federal interventions in a state trial is entirely appropriate when "extraordinary circumstances" render the state proceeding unfair. *Id.* at 53–54, 91 S.Ct. at 754–55; *see also Middlesex County Ethics Commn. v. Garden State Bar Ass'n.*, 457 U.S. 423, 437, 102 S.Ct. 2515, 2524, 73 L.Ed.2d 116 (1987). No federal judge worth his salt would think it a duty to do nothing if a state prisoner was being subjected to conditions tantamount to torture. Judge Zirpoli was not a do-nothing judge. If this court's analysis of the case is correct, extraordinary circumstances justifying his intervention were present.

Rather than speculate to his reasons as the majority does at footnote 5, we may take note of Judge Zirpoli's clear distinction between the trial in his court and the murder trial in Marin. In his court the defendants were seeking benefits; they had every reason to present themselves as model prisoners. In the murder trial their objective, as Judge Zirpoli himself observed, was to frustrate the proceedings. Under those circumstances, unless due process was being denied, there was no reason for a federal court to intervene even though that court had found the chains in other circumstances to be an unconstitutional imposition.

The rationale for deference to a trial judge on credibility is the trial judge's opportunity to evaluate the live witnesses.

Judge Zirpoli evaluated the very testimony on which the magistrate and the district court in this case relied. Judge Zirpoli made these findings explicitly contradicting present Spain's claims:

> Plaintiffs were found to be in good physical condition following physical examinations by Dr. Kasch and Dr. Oliva, and psychiatric evaluations disclosed no psychoses. Findings by plaintiffs' doctors and psychiatrists to the contrary, in the court's view, were clearly controverted or at best constitute a difference of medical opinion. The allegation of improper use of drugs required competent expert testimony and no such testimony was provided by plaintiffs. Some of the plaintiffs have athlete's foot. This is not a medical problem, but rather a matter of personal hygiene.

*Spain v. Procunier*, 408 F.Supp. at 546.

This court now finds Spain to have had "a chronic back problem" exacerbated by the chains. This court now believes Spain's assertion of April 1975 that he was frequently experiencing "muscle cramps, spasms, and pulled muscles." This court now accepts Spain's claim that his physical condition "deteriorated markedly." This court now concludes that Spain was found to have attended his trial for seventeen months in a "physically and mentally debilitated condition." All of these conclusions are contrary to the contemporaneous findings of Judge Zirpoli.

Judge Zirpoli's explicit finding was that Spain had not shown that his physical condition was other than good. This court attempts to avoid the impact of this finding by implying that Spain could have been found in good physical condition in San Quentin while not being in good physical condition in the courthouse. It is difficult to see how his "condition" could have "deteriorated markedly," as the court finds, while he remained in "good physical condition" at San Quentin. It is difficult to see how a judge so meticulous in his findings as to health as to note the presence of athlete's foot would have missed the major ailments Spain claims he suffered.

The magistrate found that Spain was impeded in consultation with his counsel and therefore also impeded in his ability to testify. The district court inflated the finding of the magistrate to a finding that Spain was *unable* to cooperate with his counsel. This court accepts the judgment of the district court based on these findings. All of them are contrary to the contemporaneous findings of Judge Zirpoli. The district court's inflated finding has no basis at all in the record.

These findings are also contrary to what we know from the judicial record in *Spain v. Procunier* actually happened: Chained as he was, except in the federal court itself, Spain was able to communicate with Garry and to launch a habeas corpus proceeding so successful that it at first relieved him of chains even at the Marin murder trial. A prisoner and counsel who succeed so well do not plausibly contend that they could not deliberate together or prepare together or decide together.

## THE EXISTENCE OF ALTERNATIVES TO CHAINING

The majority concludes that alternatives to chaining were available, and that the district court failed to consider them. The evidence does not support this conclusion, and the defendant failed to satisfy his burden of proof on this issue. Spain offered no evidence as to what alternatives the trial court could have adopted. The magistrate made no findings on this subject. The district court found, however, that the shackles were not used as "a last resort." The district court said that the trial court "should have given the defendants a warning that if the disruptions did not cease, then shackles would be imposed." The district court accepted "the argument that complete unchaining would have worked."

Without any evidence at all, and in disregard of Spain's repeated acts of misconduct in pretrial proceedings but operating apparently on a hunch, the district court came to the conclusion that complete unchaining "would have worked." The district court did not observe that Spain had taken the position that not only must he be completely unchained but that all of the defendants must be completely unchained. Garry, his counsel, stated unequivocally to the trial court that Spain would not accept unshackling unless his codefendants were unshackled.

The district court evidently understood literally the phrase "last resort" used by the Supreme Court in *Allen*, with the implication that chains were to be applied only after other measures had been tried and failed. But the Supreme Court had spoken of chaining combined with gagging as a last resort, and it had already been made plain that the term "last resort" was not literal and that chains could be applied in cases of "extreme need." *Harrell v. Israel*, 672 F.2d 632 (7th Cir.1982), or in cases "urgently demanding that action." *Tyars v. Finner*, 709 F.2d 1274, 1284 (9th Cir. 1983). The teaching of those cases had been summed up as meaning that shackling is "proper where there is a serious threat of escape or danger to those in and around the courtroom." *Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir.1985). The district court did not apply this standard.

The district court also drew attention to the fact that Spain had testified in Judge Zirpoli's court without chains and without misbehaving. The district court declared that this conduct "would at the least entitle him to one opportunity to show that he would not disrupt proceedings in a courtroom with many security guards present."

The district court was aided in its guessing by an erroneous understanding of the law, viz., that there was some kind of entitlement to disrupt a trial before chaining could be imposed. The district court alternatively phrased this position as an entitlement after Spain's good behavior in the federal court before Judge Zirpoli or as a general right of defendants to be warned at least once before their disruptive behavior took place. This view of the law is squarely contrary to controlling circuit authority. *Loux v. United States*, 389 F.2d 911 (9th Cir.), *cert. denied*, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968).

This court, while affirming the judgment, takes a different tack from either of those

taken by the district court by stating that absence from the courtroom should have been adopted as an alternative. This court acknowledges that "some measure" was needed to maintain the security of the courtroom. But the court in this case goes directly contrary to other binding circuit precedent as to the burden of proof of the existence or absence of alternative remedies. The law of the circuit is that "it is incumbent upon the defendant to show that less drastic alternatives were available." *Wilson* at 1486. Spain prevails here having made no showing whatsoever on this issue.

Neither the magistrate nor the district judge made any findings that Spain proved the existence of alternatives that the trial judge could have adopted. Instead, this court embarks on its own fact-finding, and, searching the trial record, finds the following: (1) On November 30, 1973, in a pretrial proceeding, Spain moved in his own handwriting "for an order allowing me to remain in San Quentin." There was no indication that this waiver applied to the trial that began in 1975. (2) On January 11, 1974, Spain requested absence from a pretrial hearing. His counsel, arguing this motion, declared that if "there is any shackling whatsoever" Spain would not want to come into the courtroom. (3) On March 3, 1985, Spain requested to be removed from the courtroom. The court granted his request. (4) On March 18, 1978, Spain waived his right to be present at a pretrial hearing on March 18, 1978. (5) On April 11, 1975 Spain signed a waiver of his personal presence but his counsel represented this request as one to be excused on selected days. The court held a hearing on this motion and ruled that Spain could be absent from pretrial proceeding but must appear during jury selection and trial.

The record thus establishes that Spain moved five times to be excused from pretrial proceedings. The trial judge twice granted his motions. The trial judge denied his request to be excused on selected days during the trial. Spain did not renew that motion as the trial wore on and as, according to his testimony, the pain worsened. The cumulative effects of the restraints at trial were not presented to the trial judge. Spain does not sustain his burden even when the appellate court undertakes it on his behalf.

In concluding that absence was an acceptable alternative to shackling, the majority ignores the importance of the defendant's presence in the courtroom. Face-to-face, person-to-person confrontation of the accused by his accusers is fundamental, rooted in the demands of human nature, in ancient and long-established practice and in the Sixth Amendment. *Coy v. Iowa*, —— U.S. ——, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). Such a right could never have been waived by the partial, unrepeated waiver of trial presence attempted by Spain and Charles Garry.

In addition to shifting the burden of proof and deciding in favor of Spain although he has produced no evidence as to less drastic alternatives, this court has radically misinterpreted statements and action by the trial judge. This court declares that "the trial court never really considered the alternatives to shackling the defendants in order to secure the courtroom." As evidence of this conclusion, this court has gone not to any findings made below, but to the record of the state trial, and has drawn from it two statements, one made by the trial judge January 11, 1974 and the other made by him on March 24, 1975. The first statement reads: "I have to consider all of the options from the total release of restraint to continuation of the existing restraint." The second statement reads, "The court has considered every possible opportunity between freeing all or some inmate-defendants entirely from restraint, to full restraint for all inmate-defendants." Our court, having quoted those statements, goes on to say: "These statements make it plain that the trial court actually did not consider 'all of the options.'"

Such a method of interpretation of a trial judge's statements is truly extraordinary. Black means white. The trial judge says twice that he considered *all of the options*. Our court says that these statements mean the trial judge did not consider all of the options. There is no basis in any evidentiary findings made by magistrate or district court for these unusual feats of interpretation.

If one looks at what the trial judge said and did one finds that he stated for the record at the end of the trial in 1976 that he had heard repeated motions for reconsideration of the restraints imposed "and the subject of changing the restraint condition was constantly in my mind." The testimony of Spain's counsel is that at no time did Spain "seek to waive his presence," so that alternative was not presented by motion to the court. The judge, however, on June 30, 1975 made "the ruling" that "defendants could stay at the prison voluntarily absenting themselves if they desired to do so." The clerk's minutes for that day show that Spain was not present and had filed a waiver as to being present. The burden was on Spain to produce the evidence to show whether absence as an alternative to shackling continued to be open to him. He did not do so. This court departs from controlling authority in relieving him of the burden.

## CONCLUSION

John ("Johnny") Spain is a complex, intelligent human being. Through no fault of his, he was subjected to terrible suffering as a child. The outrages inflicted on him and the deep alienation he experienced in childhood undoubtedly account for the attitude he formed and the rage that was expressed in the homicidal outburst which he committed in 1967. Since that date he has spent almost all his life in prison. In recent years, according to information submitted in this case, he has been a model prisoner. He has inspired the unswerving and devoted service of his present counsel. No human being is beyond redemption. Johnny Spain appears to be a changed man. If it were our function to exercise the powers of clemency vested in the governor of California and to forgive what he has done, we might well exercise those powers.

On the other side are the dead who were his victims and what is owed the prosecutors who worked for six years to bring a difficult case to a verdict and who have worked thereafter to keep the judgment firm. They are entitled to have their work judged in accordance with law. Respect is due also to the jurors who put aside their own lives for over a year to hear the case of Spain and his co-defendants, found some innocent and some guilty. Fairness is finally due the trial judge who cannot with decency be portrayed as a torturer; rather, he was a highly conscientious man using his best judgment in possibly life-threatening circumstances.

What is most apparent in Spain's deeply felt and continuing complaint about the chains is that he perceived them as an affront to his dignity as a human being. It was an affront to be physically restrained. But it was an affront that Spain's conduct, in the trial court's view, made necessary. It is no recognition of Spain's dignity as a human being for us to dodge the question of whose conduct made the trial judge conclude that restraints were required. Ultimate responsibility for the trial court's judgment of necessity rested with Spain.

In the end, we cannot decide the case out of compassion for Johnny Spain or out of regard for the judge. It is our task to apply the Constitution of the United States, respecting the power allotted to the states and the power allotted to federal district and appellate courts.

That a prisoner should be tried in chains is a terrible qualification of the kind of justice our courts are expected to give. But there are worse qualifications. To have concluded that Spain was untriable would have been to invite vengeance not according to law. To have tried Spain without chains would have been to put the other prisoners, guards, prosecutors, judge and jury at risk. Sometimes we speak metaphorically of profaning the temple of justice. The temple of justice in the Marin County Courthouse had been physically profaned by violent invasion. The trial judge had no obligation under our Constitution to risk a repetition of those bloody events.

The opinion of the court says that Spain should not have been chained but tried in absentia. If that had been done the petition before us now might allege that he had been deprived of his right to confront the witnesses against him and his right to confer immediately with counsel. In retrospect as an imagined alternative this

course looks far better than it would have appeared if it had actually been done. In exercising our imagination as to how it might have gone we are actually substituting one discretionary judgment for another discretionary judgment.

Contrary to controlling authority, this court has put the burden of proof as to alternatives, or their absence, upon the state. Contrary to controlling authority, this court has upheld a judgment resting on the proposition that defendants who have repeatedly disrupted pretrial proceedings must be given an opportunity to misbehave at the trial itself before they are restrained. Contrary to the findings of the federal judge who heard the live evidence, this court credits Spain's complaints. Contrary to the functions of federal courts under the Constitution, this court substitutes its discretion for the discretion of the state court that conducted the trial.

In extraordinary circumstances charged with danger the trial court balanced the risk against the harms and made a fair balance that one federal district judge found damaged neither the physical health of Spain nor his right to access to the courts nor his right to counsel. We have no authority to second-guess the procedure chosen and to overturn a verdict of murder fairly rendered thirteen years ago.