**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JERRY GRANT FRYE,

*Petitioner-Appellee*,

v.

RONALD BROOMFIELD, Warden,
San Quentin State Prison,

*Respondent-Appellant*.

No. 22-99008

D.C. No.
2:99-cv-00628-
KJM-CKD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted April 11, 2024
Pasadena, California

Filed September 10, 2024

Before: Mary H. Murguia, Chief Judge, and Kim McLane
Wardlaw and Salvador Mendoza, Jr., Circuit Judges.

Opinion by Chief Judge Murguia;
Concurrence by Judge Mendoza

# SUMMARY[*]

## Habeas Corpus

In a case in which a California jury sentenced Frye to death for two first-degree murders, the panel reversed the district court's order granting a writ of habeas corpus on Jerry Grant Frye's claim that his due process rights were violated when jurors saw him shackled during trial, and remanded for further proceedings on Frye's remaining claims.

The district court determined that the state court's denial of the due-process shackling claim was not entitled to deference under Antiterrorism and Effective Death Penalty Act (AEDPA) because the decision amounted to either an unreasonable application of the law or an unreasonable application of the facts. The district court concluded that the shackling prejudiced Frye at both the guilt and penalty phases, and granted the writ.

The panel did not address prejudice under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), because Frye did not overcome the significant deference owed to an unreasoned state court decision on the merits under AEDPA.

The State argued that 28 U.S.C. § 2254(d)(1) bars habeas relief (1) because the right to be free from unjustified guilt-phase shackling was not clearly established federal law when the state court denied Frye relief in 2001; and (2) because, alternatively, the state court could have concluded that the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

shackling was harmless error under *Chapman v. California*, 386 U.S. 18 (1967). The panel rejected the argument that the right to be free from unjustified guilt-phase shackling was not a clearly established violation of federal law at the time of the state court's decision. Given the deferential nature of its review, and in light of the limited shackling evidence and the guilt evidence before the state court, the panel could not say that every fairminded jurist would conclude that the state court's harmlessness decision was objectively unreasonable.

The district court alternatively concluded that the California Supreme Court's adjudication was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). Because reasonable minds could differ about whether the state court had sufficient evidence to conclude that shackling was not prejudicial, the panel concluded that relief is unavailable on this ground.

The panel did not reach the merits of any of Frye's other pending claims under § 2254(d).

Judge Mendoza concurred. Noting that this court is required to guess what the state court's reasoning might have been before this court applies § 2254(d), he wrote separately to register his frustration with the deference that this court owes the perfunctory, two-sentence denial at issue in this capital case.

**COUNSEL**

Michael R. Snedeker (argued) and Lisa R. Short, Snedeker Smith & Short, Portland, Oregon, for Petitioner-Appellee.

Christopher J. Rench (argued), Supervising Deputy Attorney General; Kenneth N. Sokoler, Supervising Deputy Attorney General; James W. Bilderback, II, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Rob Bonta, California Attorney General; United States Department of Justice, Office of the California Attorney General, Sacramento, California; for Respondent-Appellant.

**OPINION**

MURGUIA, Chief Circuit Judge:

In 1988, a California jury sentenced Petitioner Jerry Grant Frye to death for the first-degree murders of Robert and Jane Brandt. After the California Supreme Court summarily denied Frye's state habeas petition, Frye sought habeas relief in federal court, where his forty-plus claims have been pending for over two decades. The sole issue in this appeal is claim 44, which alleges that Frye's due process rights were violated when jurors saw him shackled during the trial. The district court granted a writ of habeas corpus on that claim after concluding that the shackling prejudiced Frye. Warden Ronald Broomfield (hereafter, "the State") timely appealed.

We do not address prejudice because we conclude that Frye has not overcome the significant deference owed to an

unreasoned state court decision on the merits under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Harrington v. Richter*, 562 U.S. 86, 102 (2011). We reject the State's argument that the right to be free from unjustified shackling was not clearly established federal law when the state court denied Frye relief in 2001. *See Deck v. Missouri*, 544 U.S. 622, 629 (2005) (citing Supreme Court precedent affirming the right as "deeply embedded in the law"). But in light of the limited shackling evidence, we cannot say that every fairminded jurist would agree that the state court was unreasonable in denying relief. We therefore reverse and remand for further proceedings on Frye's remaining claims.

## I.  Background

In April 1985, Frye and his then-girlfriend, Jennifer Warsing, moved to Amador County, California, to grow marijuana for profit on a friend's gold mining claim. *People v. Frye*, 959 P.2d 183, 198 (Cal. 1998), *as modified* (Sept. 23, 1998), *disapproved of on other grounds by People v. Doolin*, 198 P.3d 11 (Cal. 2009). Frye and Warsing set up camp on the mining claim about a quarter mile from the cabin where an older couple, Robert and Jane Brandt, lived, and Warsing became friendly with Jane Brandt. *Id.*

On May 14, 1985, Warsing accompanied Mrs. Brandt on an errand, and when they returned, Mrs. Brandt invited Warsing to the cabin for coffee later that evening. *Id.* at 198-99. Warsing walked back to the campsite to find Frye talking and drinking beer with an acquaintance of the Brandts, Ron Wilson. *Id.* After Wilson left around dusk, Frye told Warsing he saw the devil moving around the campsite and thought he was being set up. *Id.* at 199. According to Warsing, Frye said that he was going to kill the

Brandts and would kill her too unless she went with him. *Id.* Frye had allegedly assaulted Warsing on several prior occasions, and she testified that Frye grabbed his shotgun and took her by the arm to the cabin. *Id.* at 198-99.

According to Warsing, Mrs. Brandt invited them inside, and Frye placed the shotgun by the kitchen doorway. *Id.* at 199. He joked with the Brandts about having a headache from drinking too much, so Warsing thought things had returned to normal. *Id.* Moments later she heard a noise and looked up to see Frye shoot both Mr. Brandt, who fell back in his chair, and Mrs. Brandt, who fell back onto the sofa. *Id.* Warsing testified that she tried to leave, but Frye forced her to help him steal the Brandts' valuables and their car. *Id.* Frye and Warsing returned to the campsite, knocked it down, and drove out of town until they reached Belle Fourche, South Dakota, where Frye said they would settle down. *Id.* at 199-200.

Bobby Brandt discovered his parents' bodies on May 16, 1985. *Id.* at 200. In addition to identifying their stolen property for the police, he recognized Frye's denim jacket in the kitchen. *Id.* Subsequently, in July 1985, Belle Fourche police responded to a disturbance at the apartment Frye and Warsing shared and arrested Frye for assault. *Id.* While Frye was sitting in the patrol car, he asked the officer, "Do you want a big one?" and said that he was wanted in California for a double murder. *Id.* Frye then gave a videotaped interview, stating that he did not know if he had killed the Brandts, but Warsing told him that he did, and he had experienced alcoholic blackouts in the past. *Id.* at 200-01. Warsing, who was also arrested, cooperated with the police, leading them to the Brandts' stolen property and to the murder weapon. *Id.* at 201.

At trial, the prosecution's evidence primarily came from Warsing, who testified as an accomplice under a grant of immunity. *Id.* Amador County Police Officer Mark Anderson testified that when Frye learned Warsing would not be charged with anything, Frye became irritated and told Anderson, "she is as guilty as I am. She is an accessory before and after the fact." *Id.* at 236. South Dakota police officer Kirk Smith testified that when he and Officer Richard Evans were transporting Frye to jail after the videotaped interview, Frye admitted to the murders. However, Officer Smith stated that he could not hear Frye very well, and Officer Evans, who was in the front seat with Frye, did not hear Frye admit to the murders. Finally, the physical evidence—including Frye's denim jacket in the Brandts' kitchen, the position of the Brandts' bodies, and the recovered murder weapon and other stolen items—largely aligned with Warsing's account. *See id.* at 199-201.

Frye's defense sought to cast doubt on Warsing's testimony by calling a professor of forensic science, who testified that the crime scene was inadequately processed and that Warsing's account did not align with the physical evidence. *Id.* at 201. The defense also called a psychiatrist who treated Frye and testified that he did not believe Warsing's account "based on what [Frye] told him of Warsing's personal history, corroborated by investigative reports." *Id.* Finally, the defense elicited testimony from Warsing that, despite her claim that she was essentially held hostage, she had done most of the driving and carried out most of the financial transactions on their trip from California to South Dakota.

In May 1988, after approximately three days of deliberation and multiple requests to examine the evidence, the jury convicted Frye of two counts of first-degree murder,

first-degree robbery, residential burglary, and vehicle theft. The jury also found true the allegation that Frye personally used a firearm during the commission of the offenses.

During the penalty phase, Frye insisted on speaking to the jury. He stated that he was "very angry," could not accept the verdict, felt the jury had treated his case "like a traffic ticket," and could not understand why the jury did not examine the evidence more closely. Frye's family testified that Frye had experienced childhood difficulties, a chaplain testified that Frye had accepted God and was a changed man, and it was stipulated that Frye's jailers would testify that he posed no disciplinary problems. *Id.* The prosecution did not call any witnesses, but it emphasized the aggravating circumstances of the crime and introduced Frye's prior felony conviction for sexual assault. *Id.* After approximately two days of deliberation, the jury sentenced Frye to death in August 1988. In 1998, the California Supreme Court affirmed Frye's conviction and sentence. *Id.* at 198. Frye did not raise the shackling claim on direct appeal. *See id.*

## A. State habeas proceedings

Frye filed a state habeas petition in April 2000 claiming, *inter alia*, that his rights to due process were violated when jurors saw him shackled in court without justification. Frye submitted evidence that, although the trial judge ruled in pretrial hearings that Frye was not to be shackled "any time he's in the courtroom," two jurors told defense investigators that they recalled seeing Frye in shackles.

In her April 2000 declaration—signed over a decade after the trial—Juror Judy Silvey said she recalled "seeing Mr. Frye in shackles: feet, wrists & waist. I recall the defense asking the court to remove them so the jury would

not form an opinion. The shackles gave him the flavor of danger." In July 2000, Juror Silvey elaborated in a second declaration that she saw Frye shackled in the courtroom during jury selection, she believed the entire jury saw him, and she recalled Frye's attorney "seemed to make a production of his request" for the court to remove the shackles. After granting the request, the judge "told the jury not to have preconceived ideas about Mr. Frye's guilt or innocence." Juror Silvey said she also saw Frye "sitting shackled on a bench near the entrance to the courtroom" at the beginning of jury selection, which she believed "was staged to make Mr. Frye appear more human to the jury." Finally, she stated that jurors "did not discuss Mr. Frye being shackled" during deliberations. Juror Narvonna Canale also recalled seeing Frye in shackles—"hands and feet"—during the trial, but she could not remember how many times or whether it occurred inside the courtroom or in the hallway.

Frye submitted declarations from two other jurors in support of other habeas claims, but those declarations did not discuss shackling. The state submitted a declaration from one of Frye's trial attorneys, Judd Iversen, stating "[a]t no time did defense counsel learn that any juror had actually observed the defendant in shackles, either inside the courtroom or out." In 2001, the California Supreme Court summarily denied Frye's petition "on the merits" without holding an evidentiary hearing.

### B. Federal habeas proceedings

Contemporaneously with his state habeas petition, Frye filed a federal habeas petition in April 2000 raising numerous claims, including the shackling claim.

A federal evidentiary hearing was held on the shackling claim in 2008. Juror Silvey testified that she recalled seeing

Frye shackled by his hands and waist both inside and outside the courtroom. She recalled seeing Frye sitting on a bench outside the courtroom almost every morning and stated that all the jurors had to pass by him. Juror Silvey could not recall how often Frye was shackled when sitting on the bench, but she clarified that he was not shackled every morning. She recalled seeing Frye shackled inside the courtroom one time toward the beginning of trial, when she was sitting in the jury box with all twelve jurors present. After defense counsel asked for Frye's shackles to be removed, Juror Silvey did not recall seeing the shackles in the courtroom again. However, she believed another juror mentioned the shackles once in the jury room prior to deliberations. Juror Canale testified that she could not recall if she saw Frye shackled inside the courtroom, but she recalled seeing him outside the courthouse shackled by his feet and wrists. She could not recall another juror mentioning the shackles.

In 2015, the magistrate judge recommended denying relief on Frye's shackling claim. The magistrate judge first concluded that the California Supreme Court's decision denying relief was not entitled to AEDPA deference because the "state court determination amounted to either an unreasonable application of the law or an unreasonable determination of the facts." But the magistrate judge concluded that Frye failed to establish that the shackling had a "substantial and injurious effect or influence" on the jury's guilt and penalty phase verdicts. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).

In 2022, the district court issued a final judgment granting habeas relief solely on the shackling claim. The district court did not disturb the magistrate judge's determination that the state court decision was not entitled to

AEDPA deference. But the district court rejected the no-prejudice recommendation, instead concluding that the shackling prejudiced Frye at both the guilt and penalty phases. Frye's remaining claims, alleging ineffective assistance of counsel, insufficiency of the evidence, jury instruction errors, and other issues, remain pending before the district court.

## II. Standard of Review

We review the district court's grant of habeas relief de novo. *Chavez v. Brnovich*, 42 F.4th 1091, 1097 (9th Cir. 2022). We review mixed questions of law and fact de novo, and we review the district court's factual findings for clear error. *Id.* at 1097 n.5. Because Frye filed his petition after 1996, AEDPA's amendments to 28 U.S.C. § 2254(d) govern review of his claim. *See id.* at 1097. Under § 2254(d), a federal court is barred from granting habeas relief on a claim that was

> adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State
court proceeding.

28 U.S.C. § 2254(d). A federal court presumes the state
court adjudicated a claim on the merits in the absence of any
indication to the contrary, and AEDPA deference applies
equally to reasoned and unreasoned state court decisions.
*Harrington*, 562 U.S. at 98-99. If a petitioner surmounts
§ 2254(d), the federal court may consider the claim de novo.
*See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). But
even then, a habeas petitioner is not entitled to relief based
on a trial error unless they can further establish that the error
resulted in "actual prejudice." *Brecht*, 507 U.S. at 637.

### III. Discussion

A federal court may not grant habeas relief to a petitioner
in state custody unless the petitioner surmounts both
AEDPA deference as set forth in 28 U.S.C. § 2254(d) and
the test for prejudice as set forth in *Brecht*. *Brown v.
Davenport*, 596 U.S. 118, 122 (2022). Because we conclude
that AEDPA forecloses granting relief, we do not reach
*Brecht* prejudice. The magistrate judge determined (and the
district court did not dispute) that AEDPA did not bar relief
because the California Supreme Court's summary denial
was "either an unreasonable application of the law" under
§ 2254(d)(1) or "an unreasonable determination of the facts"
under § 2254(d)(2). Although it is a close call, we must
disagree in light of the substantial deference that AEDPA
requires us to give to an unreasoned state court merits
decision.

### A. Section 2254(d)(1)

Section 2254(d)(1) bars granting habeas relief on a claim
that was adjudicated on the merits in state court unless the

adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Because the California Supreme Court summarily denied Frye's petition "on the merits," we must determine what theories could have supported California's decision and ask whether reasonable jurists could disagree that those theories are inconsistent with Supreme Court precedent. *Harrington*, 562 U.S. at 102. Frye bears the burden of demonstrating that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. And he must do so based solely on the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).

The state court record indicates that, over a decade after the trial, two jurors recalled seeing Frye shackled during the trial. One of those jurors said the shackles gave Frye "the flavor of danger." After Frye's attorney requested that the shackles be removed, the court granted the request and instructed the jury "not to have preconceived ideas about Mr. Frye's guilt or innocence." During the federal evidentiary hearing in 2008, the same juror testified to recalling more pervasive shackling outside the courtroom, but we may not consider that evidence in conducting our review under § 2254(d)(1). *See Pinholster*, 563 U.S. at 185.

The State argues that § 2254(d)(1) bars granting habeas relief because (1) unjustified shackling was not a clearly established violation of federal law at the time of the state court decision, and (2) the state court could have concluded that the shackling was harmless error. *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a

reasonable doubt."). We reject the first argument because the prohibition on unjustified shackling was clearly established long before the state court denied relief in 2001. *See Deck*, 544 U.S. at 626-29 (describing the right as "ancient" and "deeply embedded in the law"). But given the limited shackling evidence before the state court and the deferential nature of our review, we agree with the State's second argument. Because we cannot say that every fairminded jurist would conclude that the state court's harmlessness determination was objectively unreasonable, AEDPA forecloses relief on this ground.

### i. Clearly established federal law

Under § 2254(d)(1), "clearly established Federal law" refers to United States Supreme Court holdings, not dicta, at the time of the relevant state court decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006). The State argues that the prohibition on shackling was not clearly established until 2005, when *Deck v. Missouri* held that due process forbids the routine use of shackles during the penalty phase unless "justified by an essential state interest." 544 U.S. at 624 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986)). But as *Deck* itself acknowledged, the Supreme Court articulated the right to be free from routine shackling during the *guilt* phase many decades earlier—which our court and others have long recognized. The prohibition on routine guilt-phase shackling was therefore "clearly established Federal law" within the meaning of § 2254(d)(1) well before the state court's decision in 2001.

*Deck* is a decision in two parts. The second part addressed the question presented—whether shackling a defendant "during the penalty phase of a capital case violates the Federal Constitution." *Id.* at 624. But first the Court

considered whether due process permitted guilt-phase shackling. *Id.* at 626. Looking to its own precedents, the Court said the "clear" answer was that "[t]he law has long forbidden routine use of visible shackles during the guilt phase." *Id.*

*Deck* justified its conclusion by pointing to *Illinois v. Allen*, which "held that the Constitution sometimes permitted . . . physical restraints" for an "unusually obstreperous" defendant. *Id.* at 627 (citing *Allen*, 397 U.S. 337, 342 (1970)). But *Allen* "immediately added" that shackling was not to be used "except as a last resort." *Id.* at 628 (citing *Allen*, 397 U.S. at 344). *Allen* explained that shackling was forbidden because it could "have a significant effect on the jury's feelings about the defendant," interfere with a defendant's "ability to communicate with his counsel," and undermine the "dignity and decorum of judicial proceedings." *Allen*, 397 U.S. at 344.

*Deck* also pointed to *Holbrook v. Flynn*, which held that due process was not violated when several uniformed guards sat near the defendant during trial because conspicuous security was not "the sort of inherently prejudicial practice that, *like shackling*, should be permitted only where justified by an essential state interest." *Holbrook*, 475 U.S. at 568-69 (emphasis added). While shackling is an "unmistakable indication[] of the need to separate a defendant from the community at large," the presence of additional guards need not similarly "be interpreted as a sign that [the defendant] is particularly dangerous or culpable." *Id.* at 569. Following *Allen* and *Holbrook*, the courts of appeals, including ours, widely applied "these statements as setting forth a constitutional standard" barring unjustified shackling. *Deck*, 544 U.S. at 628-29 (collecting cases).

Because the reasons for the guilt-phase rule articulated in *Allen* and *Holbrook* applied in equal measure at the penalty phase, *Deck* concluded that due process does not permit unjustified penalty-phase shackling. 544 U.S. at 633. *Deck* therefore affirmed the Supreme Court's long-established prohibition on routine guilt-phase shackling—it did not newly establish the rule.

Our conclusion is bolstered by decades of our case law. Only United States Supreme Court holdings can clearly establish federal law, but we may "look to circuit precedent to ascertain whether [we have] already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013). Prior to *Deck*, we repeatedly cited *Allen* and *Holbrook* as establishing the rule that unjustified guilt-phase shackling violates due process. *See Spain v. Rushen*, 883 F.2d 712, 721-22 (9th Cir. 1989); *Rhoden v. Rowland* (*Rhoden I*), 10 F.3d 1457, 1459-60 (9th Cir.1993); *Rhoden v. Rowland* (*Rhoden II*), 172 F.3d 633, 636 (9th Cir. 1999); *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002), *as amended* (Mar. 11, 2002); *Dyas v. Poole*, 317 F.3d 934, 937-38 (9th Cir. 2003), *as amended* (Jan. 21, 2003).[1]

Other courts have reached the same conclusion. As early as 1976, the California Supreme Court cited *Allen* for the proposition that the defendant's visible shackling was so prejudicial as to warrant a new trial. *People v. Duran*, 545

---

[1] The State points to *Walker v. Martel*, where we assumed that the prohibition on shackling was not clearly established prior to 2005. 709 F.3d 925, 941 (9th Cir. 2013). But there we addressed an ineffective assistance of counsel claim based on counsel's failure to object to shackling, and our point was that clearly established federal law on shackling "would not have controlled our determination on [the defendant's] ineffective assistance of counsel claim." *Id.*

P.2d 1322, 1327 (Cal. 1976) (en banc). More recently, the Sixth and Eighth Circuits held that the prohibition on routine guilt-phase shackling long predates *Deck*. *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005) ("[S]hackling a defendant at trial without an individualized determination as to its necessity" was a clearly established due process violation "long before *Deck* was decided."); *Cole v. Roper*, 623 F.3d 1183, 1192 (8th Cir. 2010) ("[U]njustified restraint during the guilt phase . . . has been unconstitutional since 1986 when the Supreme Court decided *Holbrook v. Flynn*."). We therefore reject the State's argument that the prohibition on unjustified guilt-phase shackling was not clearly established in 2001.

### ii. Harmless error

The State alternatively contends that Frye is not entitled to relief under § 2254(d)(1) because the California Supreme Court could have concluded the shackling was harmless beyond a reasonable doubt under *Chapman*, 386 U.S. at 24. Given the deferential nature of our review, we must agree. In light of the limited shackling evidence and the guilt evidence before the state court, we cannot say that every fairminded jurist would conclude that the state court's harmlessness decision was objectively unreasonable.

The California Supreme Court did not provide reasons for its decision, so we must consider what theories could have supported California's denial of relief on the shackling claim. *Harrington*, 562 U.S. at 102. The State argues that the California Supreme Court could have concluded the shackling error was harmless beyond a reasonable doubt under *Chapman*. Our task is not to determine whether the California Supreme Court's conclusion was correct, but

rather whether it was objectively unreasonable. *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam).

The magistrate judge determined that the California Supreme Court's decision was unreasonable because Frye seemingly stated a prima facie shackling claim, and the state court "lacked the evidence it would have needed" to determine whether the shackling was harmless. "Without developing the facts underlying petitioner's claim," the magistrate judge explained, "there [was] no way to know how many jurors saw petitioner shackled, where they saw him, how long they saw him, or just what sort of shackles he was wearing at the time"—necessary considerations to determine whether the shackling was harmless *beyond a reasonable doubt*.

We think this issue presents a very close call. The "beyond a reasonable doubt" standard is an extremely heavy burden, and we note that one juror explicitly articulated the very reason shackling can be unconstitutionally prejudicial—it gave Frye "the flavor of danger." Were we conducting de novo review of the state court's *Chapman* application, we would find it difficult to conclude that the shackling was harmless beyond a reasonable doubt. But under AEDPA, we cannot grant relief unless "*every* fairminded jurist would agree" that the state court was not just wrong, but objectively unreasonable. *Davenport*, 596 U.S. at 136; *Esparza*, 540 U.S. at 18.

A fairminded jurist could look at the limited shackling evidence in the state court record, which indicated only one instance of in-court shackling at the outset of a trial that spanned over two months. The shackles were removed upon defense counsel's objection, and the trial court issued a curative instruction. *See Weeks v. Angelone*, 528 U.S. 225,

234 (2000) ("A jury is presumed to follow its instructions."). That fairminded jurist could also conclude that further evidence regarding the extent and impact of the shackling might not be available. Frye's former attorneys reported no knowledge of the shackling issue, and after defense investigators spent several months interviewing jurors, the result was four juror declarations, only two of which mentioned shackling.

The fairminded jurist could then consider the evidence of Frye's guilt: Warsing's eyewitness testimony, which the jury apparently found credible; physical evidence largely corroborating Warsing's account (including the position of the bodies, Frye's denim jacket in the kitchen, and the recovered murder weapon and stolen vehicle); and the minimal rebuttal evidence. *See Frye*, 959 P.2d at 199-201. And with respect to the penalty phase, that fairminded jurist could conclude the limited mitigation evidence was outweighed by the aggravating evidence and Frye's "very angry" allocution to the jury. *See id.* at 201.

Comparing the limited shackling evidence before the state court with the guilt evidence, we think a fairminded jurist could determine that the harmlessness determination was not objectively unreasonable. Because we cannot say that every fairminded jurist would agree that the California Supreme Court unreasonably applied *Chapman*, we conclude relief is unavailable on this ground under § 2254(d)(1).

## B.  Section 2254(d)(2)

The magistrate judge alternatively concluded that the California Supreme Court's adjudication was "an unreasonable determination of the facts" under § 2254(d)(2). Section 2254(d)(2) bars granting habeas relief on a claim

that was adjudicated on the merits in state court unless the adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The state court's factual determination is accorded "substantial deference," and we may not supersede it where "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (citation and internal quotation marks omitted). For similar reasons obligating our denial of relief under § 2254(d)(1), we conclude that relief is unavailable on this claim under § 2254(d)(2).

In California state courts, a summary denial of a habeas petition on the merits reflects the court's determination that the petitioner failed to state a prima facie case for relief. *People v. Duvall,* 886 P.2d 1252, 1258 (Cal. 1995) (en banc). Because Frye alleged that the jury saw him unjustifiably shackled—and therefore seemingly stated a prima facie shackling claim—the magistrate judge concluded that the state court must have either ignored the evidence before it or made factual determinations adverse to Frye without holding an evidentiary hearing. *See Hurles v. Ryan*, 752 F.3d 768, 790-91 (9th Cir. 2014).

The State contends that, instead of ignoring or discounting the evidence, the California Supreme Court could have reasonably determined that it had sufficient evidence to conclude the shackling was not unconstitutionally prejudicial. State courts are not required to hold evidentiary hearings to resolve every factual issue— if "the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question," then failing to hold an evidentiary hearing is not unreasonable under § 2254(d)(2). *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). And, the

State argues, the California Supreme Court could have concluded that additional fact-finding was not likely to reveal more information. Frye's former attorneys reported no knowledge of the shackling issue, and after months of investigation, the result was only two juror declarations that indicated seemingly brief shackling.

As with above, we think this is a close call. Were we conducting de novo review, we would have difficulty affirming the failure to hold an evidentiary hearing when one juror explicitly stated that the shackles made Frye seem dangerous. But we cannot say "that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Hurles*, 752 F.3d at 778 (citation omitted). Because reasonable minds could differ about whether the state court had sufficient evidence to conclude the shackling was not prejudicial, we conclude that relief is unavailable on this ground under § 2254(d)(2).

## IV. Conclusion

We agree with Frye that the prohibition on routine guilt-phase shackling was clearly established federal law well before the state court's decision in 2001. *See Deck*, 544 U.S. at 624 (citing *Allen*, 397 U.S. at 343-44, and *Holbrook*, 475 U.S. at 568-69). But given the limited shackling evidence before the state court, we cannot say that every fairminded jurist would agree that the state court was unreasonable in denying relief. As a result, we do not address *Brecht* prejudice, nor do we reach the merits of any of Frye's other pending claims under § 2254(d). We reverse and remand for further proceedings on those claims.

**REVERSED AND REMANDED.**

MENDOZA, Circuit Judge, concurring:

It's a strange thing to review and defer to an application of federal law that does not exist. But that is what the Antiterrorism and Effective Death Penalty Act ("AEDPA") tells us to do. When a habeas petitioner calls on our court to review a state court's summary denial of post-conviction relief, we are required to guess what the state court's reasoning might have been before we apply 28 U.S.C. § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The majority follows that charge and I cannot fault its reasoning or conclusion. I write separately only to register my frustration with the deference that we owe the perfunctory, two-sentence denial at issue in this capital case.

Frye first raised his shackling claim in his state habeas petition, which the California Supreme Court summarily denied. He challenged that decision in his federal habeas petition, and the magistrate judge determined that Frye had established that he was unconstitutionally shackled. The district court agreed with the magistrate judge on that point and concluded that the shackling prejudiced Frye. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). And now Frye's case is before us. We speculate—as we are required to—that the California Supreme Court could have concluded that the shackling error was harmless under *Chapman v. California*, 386 U.S. 18 (1967). Although we acknowledge that this is a close case, we defer to our invented state-court analysis because not every fair-minded jurist would find it objectively unreasonable. Majority at 14.

So this case hinges—as many habeas cases do—on deference. But the question that continues to gnaw at me is this: deference *to what*? The state court reasoning that we concocted? That can't be; and yet it is. Five federal judges

have studied this case: two determined that Frye was unconstitutionally shackled, and the other three recognize that it is "a close call." Majority at 12. One would think that federal judges' impressions of the federal issues presented would carry more weight. Yet, we defer to state-court reasoning that never was. That boggles my mind. And I regret that Frye will remain on death row because a hypothetical fair-minded jurist could think that an imaginary harmlessness analysis is reasonable.